Dick G. RICHARDS, as Trustee, and
Capitol Bank as Assignee,
Plaintiffs-Appellants,

v.

NEILSEN FREIGHT LINES, DiSalvo
Trucking Company, Delta Lines, Inc.,
Peters Truck Lines, Local No. 150,
Chauffeurs, Teamsters and Helpers, De-
fendants-Appellees.

No. 85–1744.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 14, 1985.

Decided Feb. 17, 1987.

**900**

James Duryea, Jr., San Francisco, Cal., and William D. Taylor, San Francisco, Cal., for plaintiffs-appellants.

Richard C. Brautigam, San Francisco, Cal., and Michael S. Rubin, San Francisco, Cal., for defendants-appellees.

Before SNEED, KENNEDY and BOOCHEVER, Circuit Judges.

KENNEDY, Circuit Judge:

Foothills Express sued four major trucking lines, and the union representing their employees, in antitrust. Foothills appeals the summary judgment dismissing the action, a judgment rendered in favor of Neilsen Freight Lines, DiSalvo Trucking Company, Delta Lines, Inc., Peters Truck Lines, and Local 150, Chauffeurs, Teamsters and Helpers Union. On appeal Foothills is represented by its trustees in bankruptcy Dick G. Richards and Capital Bank of Commerce. Foothills alleges that, with the exception of Delta, the trucking company defendants in the action were participants in a conspiracy to restrain trade involving over three hundred trucking companies engaged in the business of shipping freight in less-than-truckload quantities. It also alleges that each corporate defendant conspired with the Union to boycott Foothills to force it to recognize the Union. The district court found that the allegations of conspiracy to restrain trade presented no triable issue of fact and ruled that any union-led action, even if proven, would be shielded from antitrust liability by labor's exemption to the antitrust laws. We affirm.

All companies, including Foothills, held certificates to transport goods throughout California. Foothills is a nonunion carrier with a primary service area in the foothills region north and east of Sacramento, California. Defendants Neilsen, DiSalvo, Delta, and Peters are major trucking companies, with union contracts. Their employees are represented by Local 150. For deliveries to small communities in the foothills area, the major companies elected to carry freight in their own trucks as far as Sacramento, and then turn the cargo over to Foothills for the final leg of shipment. This practice, by which origin carriers use destination carriers for local deliveries, is known as interlining.

As all of the parties seem to agree, interlining has inherent competitive risks. With respect to certain shipping customers, local carriers are potential competitors with the companies for whom they interline. If a local carrier, such as Foothills, decides to compete with the origin carrier by soliciting its customers for the entire journey, interlining permits it to gain access to the

origin carrier's freight bills, which identify the customers, the type of freight, and the charges. If a local company uses this information in direct solicitation of the shipper, thus cutting out the origin carrier from future orders, the local carrier is said to have engaged in "back solicitation" of the customer. It also appears to be conceded that it was an industry practice for origin carriers to terminate business relations with a local carrier if the latter engaged in back solicitation, and the crux of this lawsuit is whether such terminations were made as part of a conspiracy actionable under the antitrust laws.

Foothills' interlining business with each of the defendants was cut off or substantially reduced in the spring of 1981. The defendants assert various reasons for ceasing to deal with Foothills, including dissatisfaction with Foothills' service and its failure to pay bills. For purposes of the appeal, however, we can assume that the terminations were either in response to back solicitations by Foothills, or in response to pressure by the Union on each major carrier not to interline with Foothills until Foothills recognized the Union.

Following its loss of interlining business, Foothills brought this treble damage action alleging that the defendants had terminated it pursuant to an illegal group boycott. Although Foothills alleged three different conspiracies below, only two conspiracy theories are pressed on appeal. First, Foothills claims that Neilsen, DiSalvo, and Peters were parties to a widespread agreement not to place interlining business with potential competitors, such as Foothills, who back solicited orders from customers of an origin carrier. Second, Foothills argues that the Union, in order to gain recognition from Foothills, separately coerced each trucking company to enter into discrete agreements with the Union to cease interlining with Foothills.

Foothills moved for summary judgment on the issue of liability for the alleged back solicitation conspiracy, claiming that admissions on the part of three trucking company defendants established the existence of a conspiracy among them to enforce an industrywide rule against back solicitation. Because this agreement allegedly was enforced, at least against Foothills, through a group boycott among competitors, it was said to be a per se violation of the antitrust laws. Neilsen, Peters, and DiSalvo sought summary judgment on the ground that Foothills failed to present any evidence of a conspiracy among them, and that any inference of conspiracy that might be drawn from their similar responses to Foothills' back solicitation was rebutted by evidence that each company's actions were unilateral, and legitimate, because taken in its own self interest. Finally, the Union moved for summary judgment on the ground that its activities were protected by the statutory and nonstatutory labor exemptions to the antitrust laws. The trucking company defendants claimed that any concerted action between themselves and the Union falls within one or both of these exemptions.

The district court granted the defendants' motion for summary judgment on the back solicitation conspiracy, finding that any understanding regarding back solicitation applied to individual interlining relationships only and reflected "common sense business necessity," making unreasonable any inference of an industrywide agreement governing back solicitation. We agree that a jury, or a court as finder of fact, could not infer reasonably from the proferred allegations that any defendant boycotted Foothills pursuant to an unlawful agreement with any or all of the other defendants.

The district court also granted summary judgment to the Union and corporate defendants on the claim that the Union separately coerced each of the other defendants to boycott Foothills. The trial court found that any concerted activity between the Union and any trucking company defendant fell within the statutory exemption to the antitrust laws provided by the Clayton Act § 20, 29 U.S.C. § 52 (1982), and the Norris-La Guardia Act, 29 U.S.C. §§ 101–15 (1982). We agree that the conduct in ques-

tion is protected but we rely on the nonstatutory exemption for our holding.

We first consider the trial court's determination that there was no actionable conspiracy based on termination for back solicitation. The grant of summary judgment is reviewed de novo in this court. *O.S.C. Corp. v. Apple Computer, Inc.,* 792 F.2d 1464, 1466 (9th Cir.1986). The moving party must establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1050 (9th Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); Fed.R.Civ.P. 56(c). The moving party bears the initial burden to show the absence of a material and triable issue of fact; the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense. *General Business Systems v. North American Philips Corp.,* 699 F.2d 965, 971 (9th Cir.1983) (quoting *First National Bank v. Cities Service Co.,* 391 U.S. 253, 290, 88 S.Ct. 1575, 1593, 20 L.Ed.2d 569 (1968)). It is the record made on summary judgment that controls, not that record plus speculative inferences a trier of fact might add; and the only inferences permitted from the summary judgment record itself are those that are reasonable given the substantive law which is the foundation for the claim or defense. Where a party asserts there is a genuine issue for trial, Fed.R.Civ.P. 56(e), its argument is measured by the underlying theory of the claim or defense being considered. In the context of the case before us, the substantive law is the law of antitrust, and if the claim makes no economic sense, a speculative inference from the jury will not help it. In such an instance, the record on summary judgment must contain further persuasive evidence if it is to support the claim. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* — U.S. —, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986).

In antitrust cases, the analysis above permits a defendant to rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice. *O.S.C. Corp.,* 792 F.2d at 1467–68; *Barnes v. Arden Mayfair, Inc.,* 759 F.2d 676, 680 (9th Cir.1985). Once a defendant has met this initial burden, a plaintiff must provide specific factual support for its allegations of conspiracy tending to show that the defendant was not acting independently. *O.S.C. Corp.,* 792 F.2d at 1467–68; *Barnes,* 759 F.2d at 680 (quoting *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984)); *Zoslaw v. MCA Distributing Corp.,* 693 F.2d 870, 884 (9th Cir.1982). Failure on the part of the plaintiff to produce evidence from which a jury could infer reasonably that conduct was conspiratorial, not unilateral, will lead to summary judgment for the defendant. *O.S.C. Corp.,* 792 F.2d at 1467. Even if the plaintiff's evidence is sufficient to establish a conspiracy in violation of the antitrust laws, the plaintiff cannot prevail unless it also shows that it suffered an injury resulting from the illegal conduct. *Matsushita,* 106 S.Ct. at 1356.

The district court found, and we agree, that the defendants met their burden of proferring a plausible justification for their conduct consistent with proper business practice. It is undisputed that each defendant interlined with Foothills for more efficient delivery in Foothills' service area. If Foothills used an interline relation to take business from an origin carrier, or if the origin carrier believed back solicitation was being attempted, it would be reasonable for the carrier to stop interlining with Foothills. Otherwise any efficiency in having the interline relation would be short-lived, if not illusory. It is reasonable to assume that by refusing to deal with a back soliciting destination carrier, an origin carrier was attempting to limit what Foothills itself described as the "inherent competitive risk" associated with interlining. The record indicates the origin carriers sought to limit that risk in other ways, such as choosing destination carriers who did not compete with them. Unless this

behavior was the product of a conspiracy such as that alleged by Foothills, it is not actionable under the Sherman Act. Absent conspiracy, it is not a Sherman Act violation for a firm to choose to do business with one who does not compete rather than with one who does.

■ We come now to the "gentlemen's agreement" testimony, a scrap of evidence cited by Foothills as the smoking gun revealed from pretrial discovery, evidence it relies upon for the proposition that a genuine issue for trial is presented. This is the specific evidence which Foothills identifies to support its allegation of a horizontal conspiracy. While at first glance the deposition testimony might appear to support Foothills' theory that the defendants informally agreed upon, and then enforced, an industry rule against back solicitation, further analysis shows this not to be so. Here is the testimony of Walter Peters, president of Peters:

Q. Is there an industry rule against back solicitation?

A. Just a gentlemen's rule.

Q. When you say "a gentlemen's rule," what do you mean by that?

A. Well, it's a gentlemen's agreement that we won't back solicit. There's nothing in writing. It's strictly a gentlemen's agreement.

Q. With whom do you have this gentlemen's agreement?

A. DiSalvo, Neilsen, Delta—

Q. For how long have you had this gentlemen's agreement?

A. 30, 40 years.

Foothills cites this testimony to show there is a genuine issue of fact whether each defendant ceased interlining with Foothills to enforce an industry rule against back solicitation. Foothills notes the district court's finding, made when denying plaintiff's motion for summary judgment, that a reasonable person might infer a horizontal conspiracy from the evidence. This statement is, however, dicta insofar as the court needed to make no such finding to deny Foothills' motion. In any event, in reviewing the district court's grant of summary judgment in favor of the defendants, we consider the evidence de novo, and we agree with the district court's conclusion that this evidence did not permit trial on the existence of a conspiracy.

At least three interpretations of the deposition testimony are possible. First, the testimony could document a horizontal agreement among the defendants, of the very type Foothills alleges. Second, it might refer to industrywide acceptance of the competitive reality that back solicitation was an abuse of the interlining relation. Third, it might mean there were discrete, bilateral understandings between each defendant on one hand, and its interlining company on the other, that back solicitation would not be practiced.

■ In these circumstances, the testimony is not sufficient to overcome the motion for summary judgment. Were the case to go to trial, Foothills would bear the burden of proving the existence of the alleged conspiracy and termination pursuant to that conspiracy. To discharge its burden, it would have to introduce evidence that would permit a jury to conclude that a conspiracy and resultant termination are more likely than not. 6 P. Areeda, *Antitrust Law* ¶ 1405, at 21 (1986). If the evidence produced in opposition to a defendant's motion for summary judgment does not give reasonable support to a finding of conspiratorial, as opposed to unilateral, behavior, summary judgment is appropriate. *See Anderson v. Liberty Lobby, Inc.,* —— U.S. ——, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986) (defendants' summary judgment motion requires court to ask whether reasonable jury could find by a preponderance of the evidence that plaintiff is entitled to a verdict); *O.S.C. Corp.,* 792 F.2d at 1467 (evidence must support a reasonable finding in favor of nonmoving party). The district court found from unrebutted evidence that each trucking company defendant had an independent interest in preventing back solicitation to protect its own accounts, and in consequence that it was unreasonable to infer from the cited

testimony a horizontal conspiracy. Conduct that is as consistent with permissible competitive behavior as with illegal conspiracy does not, without more, support an inference of conspiracy. *Matsushita,* 106 S.Ct. at 1362 n. 21. We agree with the district court's conclusion, and reject Foothills' contention that in reaching it the court engaged in an impermissible weighing of competing inferences. *See Barnes,* 759 F.2d at 681. If a jury verdict were based on the "gentlemen's agreement" testimony, it necessarily would be speculative. *See id.*

 There are other considerations which compel affirmance here. Foothills produced no evidence of interdependence among the defendants that might suggest each trucker's decision to terminate it was other than an exercise of independent business judgment. Foothills did not identify any instance where one origin carrier terminated it for back solicitating another carrier's accounts. Foothills has not alleged that bilateral agreements between origin and destination carriers not to back solicit are unlawful agreements, though it does argue that the number and duration of such agreements in the less-than-truckload trucking industry support an inference of a single, horizontal conspiracy among the truckers. That does not suffice, however. The fact that many, if not all, firms in an industry react similarly to a particular practice does not evidence an industry-wide agreement when there is a legitimate business purpose for each firm's behavior. Cases inferring conspiracy from a series of bilateral agreements involve interdependent behavior different from that at issue here. *See, e.g., United States v. United States Gypsum Co.,* 333 U.S. 364, 389, 68 S.Ct. 525, 539, 92 L.Ed. 746 (1948). Absent evidence tending to show joint agreement rather than individual action, parallel behavior does not support a finding of conspiracy. *See, e.g., Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 85 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970); *see also Fine v. Barry and Enright Productions,* 731 F.2d 1394,

1398–99 (9th Cir.), *cert. denied,* 469 U.S. 881, 105 S.Ct. 248, 83 L.Ed.2d 186 (1984) (consciously parallel behavior alone not sufficient to establish conspiracy).

We next consider Foothills' allegation that the Union coerced the separate defendants to boycott Foothills, a boycott Foothills claims is per se unlawful. A union-led boycott was not proven here, of course, since the case did not survive summary judgment; but the record in its present state permits us to determine the legal consequences of the boycott, if it were to be established according to the allegations. Without implying that acquiescence by each firm to the Union's demands could render them parties to an antitrust conspiracy, *see Calnetics Corp. v. Volkswagen of America, Inc.,* 532 F.2d 674, 682 (9th Cir.) (finding conspiracy), *cert. denied,* 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), *but see C & K Coal Co. v. United Mine Workers of America,* 704 F.2d 690, 699 (3d Cir. 1983) (finding no conspiracy), we hold that any restraint the Union imposed falls within the scope of the nonstatutory labor exemption to the antitrust laws. Even if such conduct were a violation of the labor law, it would bear such a close and substantial economic relation to a union's legitimate attempt to organize a specific employer that it falls well within the purpose and the coverage of the exemption from antitrust liability.

There are two exemptions from federal antitrust laws applicable to the activities of organized labor. The first of these, known as the statutory exemption, derives from the Clayton Act, 15 U.S.C. § 17 (1982) and 29 U.S.C. § 52 (1982), and the Norris-La Guardia Act, 29 U.S.C. §§ 104, 105, 113 (1982). The district court relied on the statutory exemption, and its applicability has been argued on appeal. Because we conclude the union activity in this case is shielded by the nonstatutory exemption, we need not consider whether the union-imposed restraint at issue could also be protected under the statutory exemption.

The nonstatutory exemption arises from recognition of the necessity for association to implement labor objectives. It "has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions." *Connell Construction Co. v. Plumbers & Steamfitters Local Union No. 100,* 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975). The nonstatutory exemption prevents the antitrust laws from being used to frustrate the primary and legitimate goal of the federal labor law, which is to permit employees to organize and act to improve wages and working conditions. *See id.; Bodine Produce, Inc. v. United Farm Workers Organizing Committee,* 494 F.2d 541, 551 (9th Cir.1974). Union-imposed restraints designed to improve wages, hours, and working conditions are generally shielded by the exemption, *Bodine,* 494 F.2d at 551, unless they produce significant anti-competitive effects apart from those that normally result from elimination of competition over wages and working conditions. *See Connell,* 421 U.S. at 625, 95 S.Ct. at 1836.

In considering whether the nonstatutory exemption applies in the case before us, we must determine whether the exemption may apply to agreements other than valid collective bargaining agreements. In *Bodine* we held that concerted action taken to obtain union recognition was protected although it was outside the context of a collective bargaining relation. Foothills argues that this aspect of *Bodine* has been undermined by *Connell,* 421 U.S. at 625–26, 95 S.Ct. at 1836–37, and *Sun-Land Nurseries, Inc. v. Southern California District Council of Laborers,* 793 F.2d 1110, 1116 (9th Cir.1986) (en banc). We do not so interpret the authorities.

In *Connell,* before finding that the nonstatutory exemption did not apply, the Court made an extensive analysis of the anticompetitive effect of the challenged contract, which was not a collective bargaining agreement. Such analysis would have been unnecessary if the nonstatutory exemption were limited to restraints imposed by collective bargaining agreements.

*Sun-Land* concerned a provision in a collective bargaining agreement, and it cannot be taken as holding that the nonstatutory exemption is unavailable in situations outside the context of that case, especially in light of its reliance on *Connell,* which contained no such restriction. We understand *Connell* to hold that the nonstatutory exemption is unavailable to shield agreements reached outside the context of collective bargaining where the challenged action imposes direct restraints on a business market, which restraints are not related in economics to the elimination of competition over wages and working conditions. *See Larry V. Muko, Inc. v. Southwestern Pennsylvania Building & Construction Trades Council,* 609 F.2d 1368, 1373 (3d Cir.1979) (en banc).

In the case before us, the district court found that the aim of the union-led action was to organize Foothills and so reduce wage-based competition in the less-than-truckload trucking industry. Foothills does not challenge this characterization of the evidence on appeal. The nonstatutory exemption applies unless Foothills demonstrates that the labor action created substantial anticompetitive effects tangential or unrelated to the legitimate central purpose of organizing a company. Foothills has failed to make this showing.

The union's alleged conduct here is dissimilar to that found actionable in *Connell.* In *Connell* the boycott was industry-wide. It was brought to bear on employers with whom the union had no collective bargaining relation, and it was directed to employees in which the union had no representational interest. Reciting these factors, the Supreme Court later characterized the *Connell* boycott as "novel." *See Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 653 n. 8, 102 S.Ct. 2071, 2077 n. 8, 72 L.Ed.2d 398 (1982).

Here all that is alleged is that the union pressured or persuaded certain employers, with whom it had existing collective bargaining agreements, not to do business

with Foothills, a company that was the specific target of a legitimate campaign to organize. The union-led action alleged in the case before us was created by a series of discrete, bilateral agreements not to utilize the services of a specific company that the union was attempting to organize. There was no arbitrary and ongoing exclusion of nonunion firms of the type alleged in *Connell,* in which the union did not show that it was even attempting to organize firms excluded by the challenged agreement and where firms were excluded throughout the entire market. *See also Allen Bradley Co. v. Local Union No. 3, International Brotherhood of Electrical Workers,* 325 U.S. 797, 65 S.Ct. 1533, 89 L.Ed. 1939 (1945) (condemning agreement that effectively excluded competition by nonlocal firms). Foothills was the actual and specific target of an organization campaign which, if successful, would have ended the union pressure and permitted Foothills to exploit competitive advantages not derived from substandard wages and working conditions. The union action did not freeze the terms by which a large portion of the industry conducted business. *See Connell,* 421 U.S. at 623–24, 95 S.Ct. at 1835–36. It did not consolidate control of a market to one or a group of employers, and did not enable any business entity to eliminate troublesome competition. *Bodine,* 494 F.2d at 551; *see United Mine Workers v. Pennington,* 381 U.S. 657, 665–66, 85 S.Ct. 1585, 1590–91, 14 L.Ed.2d 626 (1965) (holding that union forfeits antitrust exemption if it becomes a party to a conspiracy with a set of employers to eliminate competitors of those employers). Although the challenged agreement may have had an effect on Foothills, its effect on competition, apart from competition related to wages and working conditions, was not pervasive as with the agreement at issue in *Connell.*

Foothills argues that the union-led action, effected by pressure directed at defendant union-signatory firms, constituted an unfair labor practice under 29 U.S.C. § 158(b)(4)(B) (prohibiting secondary boycotts) and 29 U.S.C. § 158(e) (prohibiting "hot-cargo" contracts). This argument has some appeal, given the broad purpose of the nonstatutory exemption to harmonize labor and antitrust policies. *See Connell,* 421 U.S. at 622, 95 S.Ct. at 1835; *Sun-Land Nurseries,* 793 F.2d at 1115. Furthermore, the Court in *Connell* found that, regardless of whether or not 29 U.S.C. § 187 provides the exclusive remedy for persons injured by secondary activities prohibited by section 158(b), there was no indication that Congress intended to preclude antitrust suits based on the hot cargo agreements outlawed under section 158(e). *Connell,* 421 U.S. at 634, 95 S.Ct. at 1840; *Telecom Plus, Inc. v. Local Union No. 3,* 719 F.2d 613, 614–15 (2d Cir.1983) (per curiam) (citing *Connell* ).

■ The Supreme Court's consideration, however, of the actual and potential anticompetitive effects of the agreement independently of the violation of section 158(e) suggests that the presence of a section 158(e) violation may not itself decide the exemption issue. This is particularly true where, as here, the labor provision violated is designed to protect parties in the position of the defendants. *See Associated General Contractors v. NLRB,* 514 F.2d 433, 437 (9th Cir.1975). *Connell* does not suggest that every violation of section 158(e) gives rise to an antitrust suit. It is not paradoxical that a labor law violation may still be within the antitrust exemption, for the violation will carry its own remedies under the labor laws, although we recognize that in some cases a violation of the labor laws may involve conduct whose consequences are so far-reaching that it falls outside the exemption. Where, as here, there is no showing the alleged agreements pose actual or potential anticompetitive risks other than those related to a reduction in competitive advantages based on differential wages or working conditions, the nonstatutory labor exemption prevents antitrust scrutiny of the union activity.

Accordingly, we affirm the judgment of the district court.