BREAKDOWN SERVICES, LTD.,
a California corporation,
Plaintiff,

v.

NOW CASTING, INC., a California corporation, Defendants.

No. CV 05–06732 DDP (CTx).

United States District Court,
C.D. California.

Jan. 25, 2007.

Steven P. Krakowsky, Steven P. Krakowsky Law Offices, Los Angeles, CA, for Plaintiff.

Christopher Grivakes, Stephen Allen Bost, Ives Kirwan & Dibble, James R. Noblin, Blecher & Collins, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO AMEND COUNTERCLAIM AND ANSWER; GRANTING SUMMARY JUDGMENT

[Defendant's Motion to Amend Counterclaim filed on October 16, 2006; Plaintiff's Amended Motion for Summary Judgment filed on October 16,2006]

DEAN D. PREGERSON, District Judge.

This matter is before the Court on Now Casting Inc.'s ("NCI") motion for leave to amend its counterclaim and answer and on Breakdown Services, Ltd.'s ("BSL") motion for summary judgment on the counterclaim or, in the alternative, for partial summary judgment on the counterclaim. After reviewing the papers submitted by the parties and hearing oral argument, the Court grants in part and denies in part NCI's motion to amend the counterclaim, and grants BSL's motion for summary judgment.

### I. BACKGROUND

This litigation involves the "theatrical breakdowns" market. A theatrical breakdown is comprised of short character role descriptions of available acting parts in an upcoming film or television production. The suppliers of breakdowns are casting companies hired by studios and production companies who cast film and television projects; the "middlemen" who publish and distribute the breakdowns are BSL and NCI (the parties in this action), and

the buyers of the breakdowns are talent agents, managers and/or actors who submit their clients or themselves to the casting companies for consideration for roles in the breakdowns.

A casting company may supply casting information to a breakdown services company such as BSL or NCI in two different ways. A casting company may write its own breakdown and then send it to BCL or NCI for publication. Alternatively, the casting company may send a script to the breakdown services company and ask it to write the breakdown. In either case, the casting company supplies the casting information to BSL or NCI for free and authorizes the release of the final version of the breakdown.

This dispute arises out of the longstanding competitive relationship between Gary Marsh of BSL and Rick LaFond of NCI. BSL is an entrepreneurial enterprise formed by Gary Marsh in 1971. BSL delivers its breakdowns to its primary clientele—talent agents and managers—via the internet for a monthly fee (the "agent model"). In addition, since 1997, BSL has published a relatively small subset of the breakdowns directly to actors. Those breakdowns are made available to actors on BSL's "Actors Access" website.

NCI is a competitor of BSL that was formed in 2002. NCI sells actors access to breakdowns published on its website (the "actor model"). It also provides free website access to the breakdowns, for talent agents and managers. NCI is operated by Robert Stewart and Rick LaFond.

This action came before the Court on BSL's complaint against NCI for copyright infringement. The subject of BSL's complaint is a breakdown entitled "Just A Phase—Triangle of Trust." BSL alleges that it created and published the "Triangle of Trust" breakdown after reading a script it received from Collin Daniel, the casting director for the Triangle of Trust pilot.

BSL further alleges that NCI published a copy of this breakdown in violation of BSL's copyright in the breakdown. BSL further alleges that NCI and its owner, LaFond, have a history of illegally copying BSL's breakdowns.

In response, NCI filed a counterclaim against BSL. In its counterclaim, NCI alleges that BSL and Marsh contacted casting directors who had used NCI's services, and, by implied threat or coercion, induced them to stop using NCI's services by making false, disparaging and defamatory statements about NCI and the quality of its services. (Countercl.¶¶ 14, 43, 53). NCI also alleges that BSL and Marsh made false, disparaging and defamatory statements against NCI and its principals. (*Id.*) NCI further alleges that BSL and Marsh informed casting directors that if they continued to use NCI's services in the actor market, BSL would not disseminate their role descriptions in the future in the talent agency market. (*Id.* ¶ 14.) Finally, NCI alleges that BSL filed its complaint solely for anti-competitive purposes in an effort to force NCI out of business. (*Id.* ¶¶ 18, 43.) Accordingly, NCI asserts the following causes of action in its counterclaim: (1) Sherman Act violation, 15 U.S.C. § 1; (2) Sherman Act violation, 15 U.S.C. § 2; (3) Cartwright Act violation, California Business and Professional Code § 16720; (4) unfair competition, California Business and Professional Code § 17200; (5) intentional interference with prospective economic advantage; and (6) slander.

The parties participated in discovery for eleven months. They exchanged multiple sets of written discovery and conducted over twenty depositions.

BSL now moves for summary judgment on, or, in the alternative, summary adjudication or, NCI's counterclaim. NCI moves to amend its counterclaim.

## II. DISCUSSION

### A. *Motion for Leave to Amend Counterclaim and Answer*

#### 1. *Legal Standard for Leave to Amend*

 Federal Rule of Civil Procedure 15(a), which governs requests for leave to amend, provides that "leave shall be freely given when justice so requires." Fed. R.Civ.P. 15(a). Grant or denial of leave to amend rests in the sound discretion of the trial court. *Swanson v. United States Forest Service*, 87 F.3d 339, 343 (9th Cir. 1996). The burden of persuading the court that leave should not be granted rests with the non-moving party. *See DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186–87 (9th Cir.1987). Leave to amend should be freely given unless the opposing party can show reason for denial, such as undue delay, prejudice, futility of amendment, or dilatory motive. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *see also Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir.1989).

##### a. *Undue Delay*

 Although delay is not a dispositive factor in the amendment analysis, it is relevant. *Lockheed Martin Corp. v. Network Solutions, Inc.*, 194 F.3d 980, 986 (9th Cir.1999); *but see Swanson v. United States Forest Service*, 87 F.3d 339, 345 (9th Cir.1996)(denying leave to amend and citing undue delay as the only factor). Courts have denied leave to amend where the moving party either knew or should have known when drafting the original pleading the facts on which the amendment is based, but did not include them in the original pleading. *Kaplan v. Rose*, 49 F.3d 1363, 1370 (9th Cir.1994); *see also Invest Almaz v. Temple–Inland Forest Products Corp.*, 243 F.3d 57 (1st Cir.2001)(holding that what plaintiff should have known and what he should have done

"are relevant to the question of whether justice requires leave to amend").

##### b. *Prejudice*

 Prejudice is the touchstone of the inquiry under Rule 15(a). *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir.2003). Absent prejudice, or a strong showing of any of the remaining reasons for denying leave to amend, there exists a presumption under Rule 15(a) in favor of granting a leave to amend. *Id.* at 1052. To justify denial of leave to amend, the prejudice must be substantial. *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir.1990).

##### c. *Futility of Amendment*

 Leave to amend may be denied if the proposed amendment is futile or would be subject to dismissal. *Saul v. United States*, 928 F.2d 829, 843 (9th Cir.1991). However, before discovery is complete, a proposed amendment is "futile" only if no set of facts can be proved under the amendment which would constitute a valid, claim or defense. *Miller v. Rykoff–Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir.1988).

#### 2. *Analysis*

NCI seeks leave to amend its answer and counterclaim in four different manners. The Court deals with each in turn.

##### a. *Amendment to Sherman Act § 1 Counterclaim*

NCI seeks to amend the first cause of action in the counterclaim by including a second market, the talent agency market, to the Sherman Act § 1 claim. As it stands, the section 1 claim alleges that BSL "uses its market dominance in the relevant talent agency market" to "restrain trade in the relevant actor market." (Countercl.¶ 23.) As discussed below, this Court is granting BSL's motion for summary judgment on this cause of action.

Although the manner in which NCI has pleaded the Sherman Act claims invites confusion, the Court nonetheless finds that the amendment sought by the NCI does not alter the Court's analysis regarding summary judgment. As the amendment sought is therefore futile, the Court denies leave to amend.

### b. Amendment to Sherman Act § 2 Claim

 NCI seeks to amend the second cause of action to add a count of actual monopolization. (Mot. to Am. Countercl. and Answer 2:16–17.) As discussed below, the Court grants summary judgment on the attempted monopolization theory of the Sherman Act § 2 claim. The deficiencies NCI's attempted monopolization theory would likely permeate any monopolization claim as well.[1] Moreover, NCI brought this motion after 11 months of discovery and only three months before trial. There is no indication that it could not have alleged a claim for actual monopolization in its original complaint. Finally, permitting NCI to add this theory at this stage in the litigation would substantially prejudice BSL. Accordingly, the balance of the factors does not weigh in favor of granting leave to amend this cause of action to add a theory of actual monopolization.

### c. Amendment to Counterdefendants

NCI seeks to add Gary Marsh as a counterdefendant to the first, second and third causes of action in the counterclaim. Gary Marsh is already a counterdefendant in the fourth, fifth and sixth causes of action in the counterclaim. As noted above, the Court grants summary judgment to BSL on the first, second, and third causes of action in the counterclaim. The addition of Gary Marsh as a counterdefendant to these three causes of action would not alter the Court's summary judgment analysis. Therefore, the Court denies leave to amend to add Gary Marsh as a counterdefendant to the first, second and third causes of action.

### d. Amendment of Tenth Affirmative Defense

 NCI seeks leave to amend the tenth affirmative defense asserted in the Answer. As it stands, the tenth affirmative defense is premised on the doctrine of unclean hands and states that "plaintiff's recovery on the purported causes of actions in the Complaint are barred by plaintiff's unclean hands." (Answer ¶ 27.) NCI now seeks to amend this defense to include allegations of copyright misuse.

 Under the doctrine of unclean hands, a plaintiff's copyright infringement claim may be dismissed "if defendant establishes that plaintiff's evidence was false and that plaintiff was involved in a scheme to defraud the public." *Supermarket of Homes, Inc. v. San Ferndando Valley Board of Realtors,* 786 F.2d 1400, 1408 (9th Cir.1986). "The defense of unclean hands by virtue of copyright misuse prevents the copyright owner from asserting infringement and asking for damages when the infringement occurred by dereliction of duty." *Id.*

Although NCI's request for leave to amend at this late stage of the proceedings indicates a lack of due diligence, BSL would suffer no prejudice if this defense

---

**1.** To prove a claim of monopolization under Sherman Act § 2, a plaintiff must prove that the defendants: (1) possessed monopoly power in the relevant market; (2) willfully acquired or maintained that power; and (3) antitrust injury. *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997). Because willful acquisition or maintenance of monopoly power for purposes of monopolization requires proof that defendant engaged in predatory conduct, proof of such conduct is an element common to both monopolization and attempted monopolization under the Sherman Act § 2.

were amended. There is essentially no other way to interpret an unclean hands defense in a copyright infringement suit other than involving copyright misuse. Therefore, while it does not seem necessary for NCI to amend the tenth affirmative defense to include "allegations of copyright misuse," (Mot. to Amend Countercl. 2:24–25), as such allegations are clearly implied, the Court nonetheless grants leave to amend based on the fact that BSL will not be prejudiced by amendment.

**B.** *Plaintiff's Motion For Summary Judgment On The Counterclaim*[2]

**1.** *Legal Standard*

 Summary judgment is appropriate where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. *Id.* at 252, 106 S.Ct. 2505. In determining a motion for summary judgment, all reasonable inferences from the evidence must be drawn in favor of the nonmoving party. *Id.* at 242, 106 S.Ct. 2505.

 A moving party may carry its initial burden on summary judgment by "showing" the opposing party lacks sufficient evidence to carry its ultimate burden of persuasion at trial—that it does not have evidence from which a jury could find an essential element of the opposing party's claim or defense. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102 (9th Cir.2000). In short, the opposition evidence must be such that it could cause reasonable persons to disagree on whether the facts claimed by the moving party are true "enough to require a jury or judge to resolve the parties' differing versions of the truth.' " *Aydin Corp. v. Loral Corp.,* 718 F.2d 897, 902 (9th Cir.1983). If the opposition evidence is merely "colorable" or "not-significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

**2.** *Sherman Act Section One*

**a.** *Legal Standard*

 To establish a claim under § 1 of the Sherman Act, the plaintiff must show: (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce. *Bhan v. NME Hosp., Inc.,* 929 F.2d 1404 (9th Cir. 1991).[3] For an agreement to constitute a violation of § 1 of the Sherman Act, a "conscious commitment to a common scheme designed to achieve an unlawful objective" must be established. *Monsanto*

---

**2.** On November 17, 2006, NCI lodged an *ex parte* application to strike certain evidence submitted in BSL's Reply. After reviewing the papers submitted by the parties, the Court is inclined to find that NCI has not proven how it is prejudiced by the papers filed by BSL in its Reply. Accordingly, the Court denies the *ex parte* application for insufficient good cause shown.

**3.** Section 1 of the Sherman Act states in relevant part: "Every contract, combination ..., or conspiracy, in restraint of trade or commerce ... is hereby declared to be illegal." 15 U.S.C. § 1.

*Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984) (internal quotation and citation omitted). Since it is often difficult to show direct evidence of a combination or conspiracy, concerted action may be inferred from circumstantial evidence of the defendant's conduct and course of dealings. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 671 (9th Cir.1980). Antitrust law, however, limits the range of permissible inferences from ambiguous evidence in a § 1 case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

> *Matsushita* is the Supreme Court's foremost explanation of how summary judgment works in the antitrust context. The *Matsushita* Court ... cautioned ... that, although plaintiffs are to be given the benefit of the doubt, they "must do more than simply show that there is some metaphysical doubt as to the material facts." Importantly, "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." Instead, an inference of conspiracy is sustainable only if "reasonable in light of the competing inferences of independent action," and "to survive a motion for summary judgment ..., a plaintiff seeking damages for a violation of § 1 must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently." .... The Court warned that permitting the inference of conspiratorial behavior from evidence consistent with both lawful and unlawful conduct would deter pro-competitive conduct—an especially pernicious danger in light of the fact that the very purpose of the antitrust laws is to promote competition....

*In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir.1999) (citations omitted).

■ The Ninth Circuit has outlined a two-part test to be applied whenever an antitrust plaintiff rests its case entirely on circumstantial evidence. First, the defendant can "rebut an allegation of conspiracy by showing a plausible and justifiable reason for its conduct that is consistent with proper business practice." *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 902 (9th Cir.1987). Next, the burden shifts back to the plaintiff to provide specific evidence tending to show that the defendant was not engaging in permissible competitive behavior. *Id.*

■ Summary judgment should be granted for the defendant unless the evidence as a whole would allow a reasonable fact finder to conclude not just that the evidence is consistent with a conspiracy but that the alleged conspiracy *is more probable than not.* II Philip E. Areeda et al., Antitrust Law ¶ 308c (2d ed.2000)(emphasis added). In other words, "[m]ere circumstantial evidence of conspiracy cannot defeat summary judgment unless it would allow an inference that conspiracy is more probable than an inference of independent action." *Id.* ¶ 308c. When the evidence is in equipoise on a matter that a party must establish by a preponderance of the evidence, summary judgment will be granted against that party. *Id.* ¶ 308b.

#### b. *Analysis*

The thrust of NCI's Sherman Act § 1 claim is as follows: NCI formed as a breakdown services company in or around 2002. BSL was in a dominant position within the breakdowns market until NCI was formed. After NCI was formed, Marsh became concerned with losing business to NCI. Thus, Marsh called casting companies who were using NCI and asked them to refrain from using NCI's services. Marsh's phone calls often contained direct or indirect threats that BSL would no

longer post breakdowns for that casting company if it continued to use NCI. As a result of the phone calls, these companies stopped using NCI's services.

The foregoing are the primary allegations made by NCI. In response, BSL asserts that NCI's version of events has not been confirmed by the depositions of the relevant casting directors and employees. In other words, BSL contends that there is no evidence, circumstantial or direct, to suggest that Marsh did in fact coerce the casting directors to stop using NCI's services. Moreover, BSL argues, even if Marsh had called the casting directors to complain about NCI, making a complaint about a competitor's behavior does not constitute a violation of the Sherman Act, and does not indicate that there was an agreement between the casting directors and BSL to exclude NCI from the market.

As in most Sherman Act cases, NCI has no direct evidence of any agreement, combination or conspiracy between BSL and the casting companies. *See, e.g., In re Citric Acid Litig.*, 191 F.3d at 1093–94 ("Direct evidence in a Section 1 conspiracy must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted.")(quotation and citation omitted). Instead, NCI bases its claim exclusively on circumstantial evidence. Applying the two-part test, the Court will first examine whether BSL has set forth a "plausible and justifiable reason for its conduct that is consistent with proper business practice." *T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 632 (9th Cir.1987) (citation omitted). If BSL meets this initial burden, the Court will then examine whether NCI has come forward with evidence that is "capable of sustaining a rational inference of conspiracy and that tends to exclude the possibility that the defendant

acted independently." *T.W. Elec.,* 809 F.2d at 632.

### i. *BSL's Reason*

■■■ As an initial matter, the Court notes that NCI has identified four casting companies that allegedly were part of the conspiracy to boycott NCI: (1) Valko/Miller Casting; (2) Vicki Rosenberg Casting; (3) Cecily Adams Casting; and (4) FMW Casting. BSL has submitted the depositions of employees of these casting companies in support of its motion. Each of these deponents stated that Marsh had never threatened them to stop using NCI. Moreover, one deponent stated that she could not remember a period of time when she stopped using NCI. (Fiorentino Dep. 16:16–25.) Another deponent stated that his company still uses NCI on certain projects. (Pappas Dep. 26:6–19.)

BSL offers several explanations of why these casting compares might have stopped doing business with NCI. First, BSL has been in the industry for a longer period of time than NCI, and thus has more contacts with talent agents and managers. Second, casting companies were more comfortable using BSL as their breakdown service provider because BSL primarily used the "agent model" for releasing breakdowns, not the "actor model" used by NCI. Finally, because NCI used the "actor model," casting companies were receiving double submissions and submissions from actors who were unqualified for the roles or lacked union representation. Thus, BSL offered a better service than NCI.

BSL has also explained why it made certain phone calls to the casting directors regarding NCI. BSL claims that, on several occasions, it learned that NCI had released a breakdown that was either similar or identical to a breakdown that BSL had offered. In those instances, BSL would call the casting company that had released

the breakdown to discover whether it had authorized NCI to release the breakdown. In some instances, BSL alleges, it learned that NCI had not been authorized to release the breakdown. Thus, BSL made the phone calls to ensure that the casting companies would not release breakdowns to NCI that BSL had authored.

▆ Finally, BSL notes that making a complaint about a competitor to a supplier is insufficient to establish antitrust liability. *See, e.g., The Jeanery, Inc. v. James Jeans, Inc.,* 849 F.2d 1148, 1155 (9th Cir. 1988)("A plaintiff must introduce 'something more' than evidence of complaints and termination alone ... [t]here must be 'direct or circumstantial evidence' that reasonably tends to prove ... 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'") (citation omitted).

In sum, BSL's position is that the evidence does not support an inference of a conspiracy, that the casting companies had independent reasons for choosing BSL over NCI, and that any phone conversations between Marsh and the casting companies reflected BSL's legitimate business concern that NCI was gaining access to BSL's work product. The Court therefore finds that BSL has set forth a plausible and justifiable reason for its conduct that is consistent with proper business practice.

### ii. *NCI's Response*

▆ Because BSL has met its burden of setting forth a plausible reason for the phone calls that is consistent with proper business practice, NCI must come forward with evidence that is capable of sustaining a rational inference of conspiracy and tends to exclude the possibility that BSL acted independently.

▆ First, NCI argues that BSL has a monopoly in the relevant product and geographic markets, and that its monopoly power is relevant to its ability to coerce both its suppliers (casting companies) and buyers (talent agents and managers) to restrain trade. Here, the Court simply notes that monopoly power alone is insufficient evidence to give rise to the inference that BSL conspired with casting companies to restrain trade. NCI must do something more than show that BSL controlled a significant portion of the relevant market.

▆ Second, NCI contends that BSL sought to unreasonably restrain trade by attempting to divide the market and eliminate competition To support this contention, NCI has submitted a partially executed document drafted by Star Caster Network. This document indicates that in 1999, BSL, the Academy of Motion Picture Arts and Sciences, and Star Caster engaged in discussions regarding a possible venture to jointly develop and market an electronic submission system to replace the internet system used by the Link and the private network service used by Star Caster. (Def.'s Ex. 2.) These negotiations fell through when Star Caster revealed its poor financial status. (Marsh Supp. Decl., Ex. 1.) NCI argues that this unsigned agreement is evidence of BSL's intent to "restrain trade" and "divide the market". However, this evidence does not support an inference that Marsh conspired with casting directors to put NCI out of business. Although NCI would like the Court to consider this as evidence of BSL's history of unreasonably restraining trade, this document—created years before the alleged conspiracy occurred—does not have any bearing on the existence of the conspiracy that is the subject of NCI's § 1 claim. Finally, the Star Caster Agreement, if executed, would have represented an alliance between two competitors in the entertainment industry. As the Supreme Court recently explained, "[w]hen persons who would otherwise be competitors pool

their capital and share the risks of loss as well as the opportunities for profit ... such joint ventures are regarded as a single firm competing with other sellers in the market." *Texaco Inc. v. Dagher*, 547 U.S. 1, 126 S.Ct. 1276, 1280, 164 L.Ed.2d 1 (2006) (finding such an agreement reasonable and not anti-competitive for purposes of § 1 liability).

Third, NCI argues that BSL seeks to unreasonably restrain trade by inserting a "covenant not to compete" in its "Script Analysis Agreements" which its subscribing talent agents and managers must sign. However, a plain review of the language of the Script Analysis Agreement reveals that it only prohibits agents, and managers from possessing an ownership interest in a competitor of BSL; it does not prevent the agents and managers from using a competitor's services. (Def.'s Ex. 3.) Moreover, there is no evidence that the language in the Script Analysis Agreement caused anyone in the entertainment industry to refrain from using competing services. Thus, the Script Analysis Agreement does not support an inference that BSL conspired with casting companies to exclude NCI from the market.

▪ Fourth, NCI argues that there is a history of BSL coercing casting directors not to use other competitors, specifically Castnet and Online Production Services. Castnet was a former competitor of BSL. In 1998, Castnet hired casting director Billy DaMota to promote its services to the casting industry. In 1999, BSL sued Castnet for copyright infringement. As part of that litigation, DaMota signed a declaration stating that Marsh had threatened to cut him off from distributing his breakdowns through BLS if he used Castnet instead of BSL, and that BSL did in fact cut him off from a period of 18 months.

However, during this litigation, DaMota testified in deposition that his representations in his 1999 Declaration were inaccurate and not based on his personal knowledge. Specifically, DaMota testified that a significant amount of the material in the 1999 Declaration was based on information told to him by LaFond (who was, at that time, the Vice–President of Castnet) and not on his own personal knowledge. (DaMota Dep. 23:2–21.) He also testified that BSL had not engaged in any retaliatory conduct. (DaMota Depo. 62:1–21.)

▪ The evidence NCI submitted to show that BSL coerced casting, employees at Online Production Services to use its services only is similarly flawed. NCI offers the declaration of Christine McGraw, a former Online employee, and the deposition testimony of Susan Fox, the president Online, in support of its claim. In her declaration, McGraw claims that several unidentified casting directors and agents told her that they had been threatened by Marsh for using Online's service. These statements, however, are hearsay, not subject to any exception.[4]

NCI also offers an anonymous e-mail that Fox claims to have received from an individual at the Ryan Artists agency in Portland, Oregon, which states that "the boss lady" was "freaked out" because Marsh had called to say that Online was going bankrupt and had been run out of LA and Toronto. (Fox. Dep. 142:11–15, 19:8 to 20:9, Ex. 5.) NCI has no evidence that this e-mail is authentic. Moreover, Rachelle Ryan, the sole owner of Ryan Artists agency at the time the e-mail was allegedly sent, disavows its authenticity. (Ryan Decl. ¶¶ 2, 3.) Thus, the Court cannot find that NCI's evidence could cause a reasonable juror to believe a conspiracy

---

**4.** Moreover, the two casting directors identified by McGraw stated that they had never made such a statement, and had never been

"cut off" by BSL. (De Lancy Decl. ¶ 4; Belshe Dep. 12:13–25; 13:1–25; 14:1–22.)

existed between BSL and the casting directors.

Fifth, NCI argues that BSL recently coerced several casting companies to refrain from supplying breakdowns to NCI. To prove this conspiracy, NCI relies significantly on the declaration of Rick La-Fond. In his declaration, LaFond states that he spoke to the employees at four casting companies and that they all told him they were no longer dealing with NCI because they did not want to deal with Gary Marsh's harassing phone calls. (La-Fond Decl. ¶¶ 3–6.) LaFond's declaration, which consists primarily of hearsay statements, could only be admitted for impeachment purposes, and not as substantive evidence of coercion itself. As stated above, every casting company employee that La-Fond identified as part of the alleged conspiracy denies that Marsh called to complain about NCI. Thus, NCI lacks any admissible evidence to support this argument.

Finally, NCI argues that BSL conspired with several talent agents and managers to contact In–Entertainment, a company that provides office/project management software to talent agencies, to remove a button from its software that allowed actors to submit their headshots and resumes using the NCI submission system.[5] As NCI points out, Marsh did admit in his deposition that he contacted several of In–Entertainment's clients and asked them to contact In–Entertainment to have them remove the electronic submission button on their system that allowed agents to submit through NCI. (Marsh Dep. 200:7–18.) However, NCI failed to note that the button on In–Entertainment's website permitted agents submitting through NCI to gain access to BSL's breakdowns without visiting BSL's website. (Greenberg Dep.

68:5–11.) As BSL argues, it is well established that a competitor does not violate antitrust laws by refusing to assist a competitor. *See, e.g., Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 407–08, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004). Here, the evidence in the record simply suggests that BSL did not want NCI to have access to its work-product; it does not give rise to an inference of an agreement to unreasonably restrain trade.

Considered as a whole, NCI has not presented any admissible or probative evidence from which a reasonable juror could infer that BSL engaged in anticompetitive conduct to coerce casting directors to refrain from doing business with NCI. In other words, the evidence in the record does not tend to exclude the possibility that BSL acted independently. Accordingly, the Court finds that NCI has failed to meet its Sherman Act § 1 burden to withstand summary judgment.

### 3. *Sherman Act Section Two*

 NCI brings a second antitrust cause of action against BSL for attempted monopolization pursuant to Section 2 of the Sherman Act. To prevail on a claim for attempted monopolization, a plaintiff must show: (1) a specific intent to control prices or destroy competition; (2) predatory or anticompetitive conduct; (3) a dangerous probability of achieving "monopoly power"; and (4) causal injury. *Image Technical Services, Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1202 (9th Cir.1997).

 In their moving papers, both parties only address the "predatory conduct" element of an attempted monopolization claim: whether there is any evidence that BSL engaged in predatory or anti-

---

**5.** BSL correctly notes that this specific claim was not alleged as a basis for antitrust liability in NCI's counterclaim and relates to events that transpired after the counterclaim was filed. (Reply 16.)

competitive conduct.[6] Predatory conduct is "behavior that not only tends to impair the opportunities of rivals, but also either does not further competition on the merits or does so in an unnecessarily restrictive way." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 605 n. 32, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985). To determine whether a defendant's conduct meets this definition, courts assess the impact of that conduct on: (1) the defendant, (2) the defendant's competitors, and (3) consumers. *Id.* at 605, 105 S.Ct. 2847.

▮▮▮ First, NCI simply states that BSL's conduct in violation of § 1 claim qualifies as predatory conduct under § 2. NCI does not specify how BSL's conduct meets the definition of predatory conduct under § 2, nor does it cite to any case law in support of this argument. For the reasons stated in its analysis of § 1, the Court finds that the evidence presented by NCI does not support any inference that BSL engaged in predatory or anticompetitive conduct.[7]

▮▮▮ NCI also argues that BSL's copyright lawsuit is a "sham" and was brought for anticompetitive purposes.[8] The Supreme Court has outlined a two-part definition of "sham" litigation in the antitrust context. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indust., Inc.*, 508 U.S. 49, 60, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993). Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. *Id.* The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation. *Id.* at 62, 113 S.Ct. 1920.

▮▮▮ Here, NCI has not submitted evidence that would indicate BSL lacked probable cause to file its lawsuit. NCI claims that it had the casting company's permission to file the "Just a Phase" breakdown. To support this claim, NCI introduced evidence of an e-mail allegedly authored by Brett Greenstein, one of the partners at Greenstein/Daniel Casting.[9] This e-mail does not specifically reference the "Just a Phrase" breakdown; it simply states: "Go ahead and release it. We wrote the descriptions so you can use them as is." (Greenstein Decl. ¶ 5, Ex. A.) This e-mail was not released in NCI's 26(f) disclosures. Nonetheless, NCI argues that BSL's insistence on maintaining its copyright action after learning of the e-mail is evidence of BSL's bad faith.[10] NCI

6. BSL only addressed the "predatory conduct" element of the § 2 claim in its motion; thus, NCI was not required to address the other elements of the claim in its opposition. *USA Petroleum Co. v. ARCO*, 972 F.2d 1070, 1074 (9th Cir.1992)

7. The Court recognizes that the *Matsushita* test requiring that circumstantial evidence tend to exclude the possibility of independent action does not apply to a section 2 claim. *Marsann Co. v. Brammall, Inc.*, 788 F.2d 611, 613 n. 2 (9th Cir.1986). Nonetheless, NCI still must present more than "colorable" evidence of predatory conduct to survive summary judgment. As the bulk of NCI's evidence is inadmissible or non-probative, NCI has failed to meet its burden.

8. NCI concedes that its "sham litigation" argument applies only to its § 2 claim. (Opp.31:26–28.)

9. Greenstein does not recall writing this e-mail. (Greenstein Decl. ¶ 6.) He docs recall that his office worked with BSL on the "Just a Phase" breakdown. (*Id.* ¶ 4.)

10. NCI makes this contention in spite of La-Fond's deposition testimony that he had no record of receiving the breakdown or casting notice from the casting director. (LaFond Dep. 47:5–12, 48:1–24.)

also argues that BSL did not properly investigate the validity of its copyright lawsuit because it did not speak with Greenstein prior to filing its complaint.

These arguments are meritless. As BSL notes, it has reason to believe that the e-mail does not refer to the "Just a Phase" breakdown. Moreover, as the e-mail was not released in NCI's 26(f) disclosures but instead nearly three months later, BSL has understandable doubts as to its validity. Finally, BSL has indicated that it spoke with Greenstein's partner, Brett Daniel, before filing the copyright infringement suit to determine whether anyone at Greenstein/Daniel had released the breakdown to NCI. For these reasons, the Court finds that the evidence in the record cannot support an inference that BSL lacked probable cause to file the copyright infringement complaint or that the complaint was filed in bad faith.

■ NCI also argues that BSL fraudulently procured its copyright for the "Just a Phase" breakdown, and that this fraudulent procurement is further indication of BSL's intent to monopolize. BSL's copyright registration form for the "Just a Phase" breakdown leaves blank the part of the form specifically designated for derivative works. BSL indicated that it left this portion of the form blank because it believed that its breakdown was not a derivative of the "Just a Phrase" script. Although NCI argues that this omission is evidence of predatory conduct, NCI has not submitted any evidence that would tend to show that this omission was not made in good faith.[11]

■ Finally, the Court notes that because the sham litigation exception may have a chilling effect on those who in good faith seek redress in the courts, it must be applied with caution. *Rickards v. Canine Eye Registration Found.*, 783 F.2d 1329, 1334 (9th Cir.1986). When the antitrust plaintiff challenges one suit and not a pattern, a finding of sham requires not only that the suit is baseless, but also that it has other characteristics of grave abuse, such as being coupled with actions or effects external to the suit that are themselves anti-competitive. *Id.*, citing *Omni Resource Development Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1414 (D.Nev.1984). Here, NCI has failed to submit any admissible evidence giving rise to an inference of predatory conduct. Accordingly, the Court grants BSL's motion for summary judgment on the Sherman Act § 2 claim.

4. *Cartwright Act*

■ "California's Cartwright Act, Cal. Bus. and Prof.Code §§ 16700–16770, is patterned after the Sherman Act." *Big Bear Lodging Ass'n v. Snow Summit Inc.*, 182 F.3d 1096, 1101 n. 2 (9th Cir.1999). Where Cartwright Act claims are premised on the same facts as Sherman Act claims, and summary judgment is granted on the Sherman Act claims, summary judgment is also appropriate for Cartwright Act claims. *County of Tuolumne v. Sonora Community Hosp.*, 236 F.3d 1148, 1160 (9th Cir.2001). The Ninth Circuit has stated:

> Appellants base their state law claim on the same facts on which they base their Sherman Act claims. We have recognized that Cartwright Act claims raise basically the same issues as do Sherman Act claims.... As a result, our conclusion with regard to the Sherman Act claims applies with

---

11. This is not to say that BSL's copyright is unquestionably valid; the invalidity of the copyright is a defense that NCI may raise in defending against BSL's infringement claim.

However, the omission of information on a copyright form, absent other evidence of bad faith intent, does not by itself give rise to an inference of antitrust liability.

equal force to appellant's Cartwright Act claims.

*McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 812 n. 4 (9th Cir.1988) (internal citations omitted). As the Court has granted summary judgment on NCI's Sherman Act claims, it must also grant summary judgment on NCI's Cartwright Act claims.

### c. *Cal. Bus. and Prof.Code § 17200*

■■■■ Section 17200, *et seq.* of the California Business and Professional Code prohibits unfair competition. Section 17200 defines "unfair competition," in relevant part, as "any unlawful, unfair or fraudulent business act or practice." The California Supreme Court recently clarified this language, stating that any allegations of unfairness to competitors must be tethered to proof of some actual or threatened impact on competition. *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal.4th 163, 186–87, 83 Cal.Rptr.2d 548, 973 P.2d 527 (1999). Thus, it adopted the following test for determining whether a business practice is unfair under § 17200:

> When a plaintiff who claims to have suffered injury from a direct competitor's 'unfair' act or practice invokes section 17200, the word "unfair" in that section means conduct that *threatens an incipient violation of an antitrust law,* or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

*Id.* at 187, 83 Cal.Rptr.2d 548, 973 P.2d 527 (emphasis added). Accordingly, in a case where plaintiff's § 17200 claim is predicated on antitrust violations that fail to withstand summary judgment, the § 17200 claim must also fail. Here, NCI's § 17200 claim is based on the same allegations the Court found insufficient to establish antitrust liability. Therefore, summary judgment is also appropriate here.

### d. *Intentional Interference With Prospective Economic Advantage*

■■■■ NCI also claims that BSL intentionally interfered with its prospective business with the casting companies. Intentional interference with prospective economic advantage requires: (1) an existing economic relationship or one containing the probability of future economic benefit; defendants' knowledge of the relationship; (2) acts designed to disrupt the relationship; (3) actual disruption of the relationship; and (4) damages proximately caused by the defendants. *Accuimage Diagnostics Corp. v. Terarecon, Inc.*, 260 F.Supp.2d 941, 956 (N.D.Cal.2003)(citing *Della Penna v. Toyota Motor Sales, U.S.A.*, 11 Cal.4th 376, 380 n. 1, 391–92, 45 Cal.Rptr.2d 436, 902 P.2d 740 (1995)). A plaintiff must demonstrate that defendants' conduct *was wrongful by some legal measure; it is not sufficient to prove merely interference itself. Della Penna,* 11 Cal.4th at 393, 45 Cal.Rptr.2d 436, 902 P.2d 740 (emphasis added). Thus, the burden rests with the plaintiff to prove that defendants' conduct was independently wrongful by presenting evidence that defendants' actions fell outside of the realm of legitimate business transactions. *Gemini Aluminum Corp. v. California Custom Shapes, Inc.*, 95 Cal.App.4th 1249, 1258, 116 Cal.Rptr.2d 358 (2002).

■■■ As discussed above, NCI has presented no admissible evidence that BSL's actions fell outside of the realm of legitimate business transactions. NCI has also failed to specify what damages it suffered as a result of BSL's interference. For these reasons, NCI also fails to meet summary judgment burden on this claim.

### e. *Slander*

■■■■ To state a claim for slander, a plaintiff must establish "the intentional

publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Arikat v. JP Morgan Chase*, 430 F.Supp.2d 1013, 1020 (N.D.Cal.2006) (citing *Smith v. Maldonado*, 72 Cal. App.4th 637, 645, 85 Cal.Rptr.2d 397 (1999); Cal. Civ.Code §§ 45–46). "Publication means communication to a third person who understands the defamatory meaning of the statement and its application to the person to whom reference is made." *Id.* (internal quotations omitted).

 In its complaint, NCI does not identify the specific slanderous statements allegedly made by BSL and Marsh. However, in its opposition, NCI submitted the declaration and the deposition of Bob Stewart, which states that Marsh "falsely told Allison Mize of DeeDee Bradley Casting that NCI was 'stealing breakdowns,' that agents and managers don't know who NCI is, and that [NCI] lies to people." (Stewart Decl. ¶ 10.) NCI asserts that these statements are all false and that they damaged NCI's professional reputation. (*Id.*) In her deposition, however, Mize states that neither Marsh nor anyone else at BSL had ever made any disparaging or defamatory statements to her about NCI or its principals. (Mize Dep. 8:12–25; 9:4–25; 10:1–10; 10:23–25; 11:1–13; 24:4–9.) She also states that Stewart had specifically asked her if she had been threatened and that she replied "no." (*Id.* 9:14–23.) She could not recall telling Stewart that BSL had ever made a disparaging statement against NCI. (*Id.* 10:1–10.)

 The Stewart Declaration and the Mize Deposition are in direct conflict. While the Court could admit Stewart's Declaration to impeach Mize's testimony, the Declaration cannot be used as direct evidence of the slanderous statement. NCI has presented no other admissible evidence that a slanderous statement was in fact made. Accordingly, the Court finds that NCI has not met its evidentiary burden and summary judgment must be granted for BSL on the slander claim.

## III. CONCLUSION

For the foregoing reasons, the Court denies the motion to amend the counterclaim and answer save for the amendment as to the tenth affirmative defense. The Court grants BSL's motion for summary judgment on the counterclaim.

IT IS SO ORDERED.