90 F.3d 386
 111 Ed. Law Rep. 124, 96 Cal. Daily Op. Serv. 5411,
96 Daily Journal D.A.R. 8817
 James DUMAS, Trustee in Bankruptcy of United College of
Business, a corporation, Plaintiff-Appellant,
v.
Samuel KIPP, III, Executive Director; Robert-Peter F.
Quider, Chief of Institutional Services,
Defendants-Appellees.
 No. 94-56146.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1996.
Decided July 23, 1996.
 
 Howard L. Horwitz, Oberstein, Doniger, Fetter, Kibre & Horwitz, Los Angeles, California, for plaintiff-appellant.
 Jonathan R. Davis, Deputy Attorney General, Los Angeles, California, for defendants-appellees.
 Appeal from the United States District Court for the Central District of California, Robert M. Takasugi, District Judge, Presiding. D.C. No. CV-92-07183-RMT.
 Before WALLACE and T.G. NELSON, Circuit Judges, and BROWNING,* District Judge.
 WALLACE, Circuit Judge:
 
 
 1
 Dumas, a trustee in bankruptcy of the United College of Business (College), appeals from the district court's dismissal without leave to amend of his third amended complaint. Dumas alleges that Samuel M. Kipp, III and Robert-Peter F. Quider, the Executive Director and Chief of Institutional Services, respectively, of the California Student Aid Commission (Commission), violated the Higher Education Act (Act) in their personal capacities. This statutory violation, Dumas argues, constitutes a violation of the College's constitutional rights. The district court exercised jurisdiction under 28 U.S.C. § 1331. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.
 
 
 2
 * The College operated a private vocational school in Los Angeles County, California. Its students were entitled to participate in the Supplemental Loans for Students Program (Program). The Program was created by the Higher Education Amendments of 1986, Pub.L. No. 99-498, Title IV, § 428A, 100 Stat. 1268, 1384 (codified at 20 U.S.C. § 1078-1). Prior to being repealed, see Omnibus Budget Reconciliation Act, Pub.L. No. 103-66, Title IV, § 4047(b), 107 Stat. 312, 364 (1993), the Program allowed "[g]raduate and professional students ... and undergraduate independent students" to borrow money, in addition to the money provided by other student loan programs. 20 U.S.C. § 1078-1(a)(1).
 
 
 3
 The Program only provided funds to students who were enrolled in an "eligible institution." The statute defined eligible institutions as those having a "cohort default rate" below thirty percent. 20 U.S.C. § 1078-1(a)(2). This rate refers to the percentage of current and former students who default on their loans when they enter their repayment period. 20 U.S.C. § 1085(m); see also 34 C.F.R. § 668.17(e)(1) (1994).
 
 
 4
 In early 1990, the Department of Education (Department) notified the College that its 1987 default rate exceeded the 30 percent statutory maximum, see 20 U.S.C. § 1078-1(a)(2), and discontinued the College students' access to program loans. The College successfully appealed from this decision to the Secretary of Education. The Department revised its findings, concluding instead that the College's 1988 cohort default rate was under 30 percent.
 
 
 5
 The Department is only one of several government and private entities that administer the Program. While commercial lenders actually provide funds to students, state agencies, or private entities specifically designated by the state, guarantee the loans and approve the commercial lenders. See generally 20 U.S.C. § 1078; 34 C.F.R. §§ 682.200(b), 682.207(b), 682.400 et seq. The State of California created its own instrumentality, the Commission, to assume this function. Cal. Educ.Code § 69761.5 (West Supp.1996). The Department reimburses the state agencies for any defaulted loans on which a guarantor agency was required to pay. The rate of Department reimbursement decreases as the default rate increases. 20 U.S.C. § 1078(c).
 
 
 6
 The Commission's actions, under the direction of Kipp and Quider, were not consistent with those of the Department. Although the Department's revised findings indicated that the College was eligible, Kipp and Quider, who may have been using a different calculation method, concluded that the College's cohort default rate was still too high. Under their authority, the Commission refused to guarantee Program loans to College students. The College alleges that as a direct result of the inability of its students to obtain loans, it lost substantial revenue. In the latter part of 1990, the College closed and declared bankruptcy.
 
 
 7
 On December 4, 1992, Dumas brought an action against Kipp, Quider, and the Commission. On April 6, 1993, he filed an amended complaint and on June 11, he filed his second amended complaint, which the district court dismissed with leave to amend on February 8, 1994. On March 21, Dumas filed his third amended complaint which was dismissed without leave to amend. The district court concluded that as a matter of law, Dumas did not state a section 1983 claim for violation of the Act. The district court's orders rejected Dumas's equal protection and procedural due process claims, but did not reach his First Amendment claim.
 
 
 8
 A dismissal without leave to amend receives de novo review. Polich v. Burlington Northern, Inc., 942 F.2d 1467, 1472 (9th Cir.1991). Such dismissals are appropriate when it is clear that the complaint cannot be saved by further amendment. Id.
 
 II
 
 9
 The district court dismissed the second amended complaint, concluding that the Act was "intended to benefit students, rather than educational institutions[, and the Act] only indicates a preference for guaranteed loans, not a binding obligation." We should affirm if we conclude that schools like the College are not the intended beneficiaries of the Act and otherwise cannot maintain a section 1983 claim for violation of the Act's provisions.
 
 
 10
 In Maine v. Thiboutot, 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980), the Supreme Court held that section 1983 provides a claim for violations of federal statutes committed under color of state law. See also Boatowners and Tenants Ass'n v. Port of Seattle, 716 F.2d 669, 671 (9th Cir.1983) (Boatowners ). The Court has also recognized that not every statutory violation gives rise to a section 1983 action. Rather, section 1983 actions are available only when several conditions are met. Among the conditions potentially relevant here is that the statute at issue must create a justiciable right. Sometimes statutory language reflects a congressional preference or entreaty, not a right or obligation. See, e.g., Pennhurst State School & Hosp. v. Halderman, 451 U.S. 1, 18, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). Also, some statutory language is too vague to create a right that courts can credibly adjudicate. Id. at 27, 101 S.Ct. at 1544; see also Suter v. Artist M, 503 U.S. 347, 363, 112 S.Ct. 1360, 1370, 118 L.Ed.2d 1 (1992) (Suter ) (holding that statutory language did "not unambiguously confer an enforceable right upon the Act's beneficiaries"). Congress must have intended the plaintiff, as opposed to the federal agency, to enforce the statutory language in contention. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 520-24, 110 S.Ct. 2510, 2523-25, 110 L.Ed.2d 455 (1990) (Wilder ); Suter, 503 U.S. at 360-61, 112 S.Ct. at 1368-69; see generally Kenneth Culp Davis & Richard J. Pierce, Jr., Administrative Law Treatise, § 19.6 at 270 (3d ed.1994). Also, the court must decide whether the right created exists "to benefit the putative plaintiff." Golden State Transit Corp. v. Los Angeles, 493 U.S. 103, 106, 110 S.Ct. 444, 448, 107 L.Ed.2d 420 (1989) (internal quotation omitted).
 
 
 11
 We begin by asking whether the statute creates a right existing "to benefit the putative plaintiff." Id. If we hold that no such right exists, we need not determine whether the other requirements necessary to maintain a section 1983 action for violation of a federal statute are present. To focus on this initial issue, we will assume, without deciding, that the Act creates some sort of right and that this right is enforceable by individuals, as opposed to the Secretary of Education. Cf. Jackson v. Culinary School of Washington, 788 F.Supp. 1233, 1258 (D.D.C.1992) (Congress intended "to remove the Secretary's enforcement decisions from the scrutiny of courts"), vacated on different grounds, --- U.S. ----, 115 S.Ct. 2573, 132 L.Ed.2d 824 (1995).
 
 
 12
 To determine whether Congress intended a disputed statute to confer rights for plaintiff's "special benefit," Boatowners, 716 F.2d at 673, we examine first the statute's text and, if necessary, the legislative history. See id.; see also Arkansas Medical Society v. Reynolds, 6 F.3d 519, 525-26 (8th Cir.1993) (reviewing statutory text to determine whether plaintiff Medicaid providers and recipients could pursue a claim for violation of a Medicaid statute provision, 42 U.S.C. § 1396(a)(30)(A)).
 
 
 13
 Divining the intent of Congress is not always an easy task. But in this case, we have little difficulty. There is nothing in the Act that indicates a congressional intent to benefit owners of post-secondary schools or to provide them enforceable rights. Our reasoning follows.
 
 
 14
 First, the Act's language, including the provisions creating the Program at issue, does not speak of providing benefits to educational institutions. Rather, the language of the statute speaks of benefits to students. See, e.g., 20 U.S.C. § 1070(a) ("[i]t is the purpose of this part, to assist in making available the benefits of postsecondary education to eligible students"); § 1078-1(a)(1) ("students shall be eligible").
 
 
 15
 Second, the sections which Dumas alleges show a congressional intent to confer rights and benefits upon educational institutions cannot be fairly said to do so. For instance, Dumas cites 20 U.S.C. § 1078(c)(2)(F), which prohibits the guarantor agency from discriminating against borrowers on the basis of "race, sex, color, religion, national origin, age, handicapped status, income, [or] attendance at a particular eligible institution." Dumas asserts that this section protects educational institutions from discrimination. However, the section's plain language prohibits discrimination against "borrowers." Further, a reasonable reading of the section reveals a congressional intent to protect students from various forms of lending discrimination. Any benefit to schools is incidental.
 
 
 16
 Similarly, Dumas calls to our attention the various procedures required by the Act--hearings, notifications, opportunities to present evidence--which allow an educational institution to contest the Department's calculation of its allegedly excessive cohort default rate. See 20 U.S.C. § 1078-1(a)(2). He also points both to regulations that require the Department to make loans available to students attending eligible institutions and to the various procedures to which the Department must adhere when disqualifying a school because of an excessive cohort default rate. See, e.g., 34 C.F.R. §§ 668.7, 668.81, 682.600. We understand these procedures as primarily intended to protect students who attend eligible educational institutions, especially those with high cohort default rates, from unfair denials of student loans. Congress needs some mechanism to ensure that the Department fairly determines eligibility. Allowing educational institutions to contest the Department's decisions certainly serves this goal. These procedures, however, do not show a congressional intent to benefit educational institutions but rather demonstrate a congressional intent to create a fair, even-handed, yet expansive government program to benefit primarily students.
 
 
 17
 Third, and highly revealing of congressional intent, is the identity of the Program's loan recipients. Supplemental loans are usually paid directly to students. 34 C.F.R. § 682.207(b)(1)(ii)(A). No statute or regulation has been called to our attention which requires either that the funds go to the educational institution in which students are enrolled or that the funds be used for tuition. Some other loan programs require direct payment to the educational institution. See 20 U.S.C. § 1087aa(c) (authorizing the Perkins Loan Program, which allocates federal funds directly to schools, which in turn loan the funds to their students); id. § 1070a(a)(1) (authorizing Basic Educational Opportunity Grant payments directly to eligible institutions, not students). Not so here. Thus, the Program's direct financial beneficiaries are students, not schools. This consideration counsels against concluding that schools are intended beneficiaries for the purposes of maintaining a section 1983 action.
 
 
 18
 Fourth, Dumas argues that we should not focus on whether the statute as a whole benefits a particular putative plaintiff, but rather the "inquiry is whether the provisions in question were intended to benefit the putative plaintiff." Dumas provides no precedential support for this theory. Indeed, most cases appear to look at the statute as a whole, or at the very least, at a particular enactment of Congress as a whole. See, e.g., Boatowners, 716 F.2d 669 (relying on general statements in the Rivers and Harbors Improvements Act to determine for which group's benefit Congress enacted the statute). Merely because a few provisions in a complex and sprawling federal statutory program benefit a particular group does not demonstrate that the statute was enacted for that group's "special benefit." Id. at 673.
 
 
 19
 Fifth, the combination of two cases, Boatowners and Parks School of Business v. Symington, 51 F.3d 1480 (9th Cir.1995) (Parks ), also leads us to conclude that schools are not the Act's intended beneficiaries. In Parks, we held that "no private right of action for educational institutions to sue loan guarantors was implied in the [Higher Education Act]." 51 F.3d at 1484. Because the loan guarantor in Parks was a private entity, not an instrumentality of the state as in this case, we rejected the section 1983 claim for failure to show state action. Id. at 1485-86. However, in determining that the Act provides no private claim, we determined that under the test enunciated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the Act was not intended for educational institutions' "especial benefit." Parks, 51 F.3d at 1484 ("Clearly, the HEA was enacted to benefit students.").
 
 
 20
 In general, the Cort test is distinct from the section 1983 test as defined in such cases as Thiboutot and Wilder. See Wilder, 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9. However, there is a connection between the two tests. In Boatowners, we recognized that "the existence of a federal right found under the analysis of the first factor in Cort ... is required in order to support a [Thiboutot-type] section 1983 action." Boatowners, 716 F.2d at 673. Our circuit, therefore, applies this part of Cort to determine whether Congress intended to benefit the putative plaintiff. As Parks has decided that this part of the Cort test is not met for educational institutions suing under the Act, we must conclude that the Act was not intended to benefit the putative plaintiff here.
 
 
 21
 These considerations require us to conclude that Congress did not intend to benefit the putative plaintiff, in this case, the College. Because we hold that Dumas failed to state a proper section 1983 claim, we do not reach Kipp and Quider's qualified immunity defense.
 
 III
 
 22
 We next decide whether the Act gives the College a protected liberty or property interest to participate in the Program. If such an interest exists and the College is deprived of participation without due process, there could be an independent basis for a section 1983 action. See Benigni v. City of Hemet, 879 F.2d 473, 478 (9th Cir.1989) (plaintiff based section 1983 suit on alleged violation of his procedural due process rights). However, because the Act did not intend to benefit plaintiffs in the College's situation, any harm resulting from administering the Act can only be termed "indirect." Procedural due process protections do not extend to those who suffer indirect harm from government action. O'Bannon v. Town Court Nursing Center, 447 U.S. 773, 787-88, 100 S.Ct. 2467, 2476-77, 65 L.Ed.2d 506 (1980). Thus, indirect beneficiaries of government programs have no due process rights. Castaneda v. United States Dep't of Agriculture, 807 F.2d 1478, 1480 (9th Cir.1987). Here the College, as an indirect beneficiary, does not have an interest on which to base its procedural due process claim.
 
 
 23
 Another circuit, examining particular student loan programs not at issue here, recognized an educational institution's liberty or property interest. See Continental Training Services v. Cavazos, 893 F.2d 877, 893 (7th Cir.1990) (Continental ) (ruling on educational institution's interest in student loan programs and concluding that "[t]he eligibility standards in the HEA provide the sort of 'substantive predicate' the courts have required before finding that property interests exist"). But even if we recognized this interest, which we do not, this interest has been held to be easily satisfied. See id. at 893-94. The statute provides for an appeals process before the Secretary, see 20 U.S.C. §§ 1078-1(a), 1082(h)(3); 34 C.F.R. § 668.1 et seq., and the Secretary may review and correct the state guaranty agencies' incorrect eligibility determinations, as long as the eligible institution does not waive this statutory review. 20 U.S.C. § 1082(h)(3)(A)(i).
 
 
 24
 Thus, even assuming a liberty or property interest were impacted, the Act's procedures provide the College with sufficient process. Because the College had an avenue of review through Department procedures, there was no violation of due process, despite Dumas's complaints about the Commission's behavior. See Parks, 51 F.3d at 1485 ("if the difficulty is simply that [the state guaranty agency] did not follow the guidelines required by the statute and regulations, that issue should have been presented to the Secretary, who was in a position to correct the problem"); see also Continental, 893 F.2d at 893-94 (holding constitutionally sufficient the process afforded disqualified educational institution for certain violations of the Act). Had this review been sought, Dumas could have appealed the Secretary's review pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 556-557.
 
 IV
 
 25
 Dumas further alleges that Kipp and Quider acted "with a pattern of intimidating, harassing and retaliatory tactics ... toward [the College] and other selected private vocational schools, which operated on a 'for profit' basis." He uses this allegation to assert a deprivation of the constitutional right to equal protection.
 
 
 26
 In order for Dumas to state an equal protection claim, he must show that the government action in question was not rationally related to a legitimate state purpose. See, e.g., Lockary v. Kayfetz, 917 F.2d 1150, 1155 (9th Cir.1990). The Commission, as well and Kipp and Quider, have a legitimate state purpose in protecting state assets, as its percentage of federal reimbursement declines with increasing default rates. Treating nonprofit and for-profit schools differently is a rational means towards that end. Nonprofit and for-profit schools have diverging interests and goals. Because they function under very different economic and market forces, they may require different regulatory treatment. Agencies can reasonably treat them differently and, in other contexts, federal courts have so held. See O'Connor v. City and County of Denver, 894 F.2d 1210, 1224 (10th Cir.1990); Weisbrod v. Sullivan, 875 F.2d 526, 529 n. 4 (5th Cir.1989).
 
 
 27
 Finally, Dumas asserts that Kipp and Quider deprived the College of its First Amendment free speech rights and that this deprivation serves as a basis for his section 1983 claim. Dumas supports this assertion factually by alleging that, by conducting an overly-intrusive audit, Kipp and Quider retaliated against the College for writing a letter critical of the Commission. Such minimal and conclusory allegations are insufficient to state a claim. See Lebbos v. Judges of Superior Court, Santa Clara County, 883 F.2d 810, 817 (9th Cir.1989) (affirming dismissal for failure to state a section 1983 claim for First Amendment violations, and requiring factual support beyond mere conclusion that certain government acts were retaliatory); Curtin v. FDIC, 866 F.2d 255, 257 (8th Cir.1989) (affirming dismissal for failure to state claim where FDIC officials' acts could not reasonably be considered retaliatory).
 
 
 28
 Considering that Dumas filed four complaints and yet continued to allege insufficient facts, the district court properly dismissed his action without leave to amend. See Allen v. City of Beverly Hills, 911 F.2d 367, 373-74 (9th Cir.1990) (affirming district court's dismissal and denying plaintiff leave to amend second amended complaint where further amendment would be futile).
 
 
 29
 AFFIRMED.
 
 
 
 *
 Honorable William D. Browning, United States District Judge, District of Arizona, sitting by designation