FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION; PACIFIC MARITIME ASSOCIATION, *Plaintiffs-Counter-Claim-Defendants-Appellees*, | No. 14-35504 D.C. No. 3:12-cv-01058-SI |
| v. | OPINION |
| ICTSI OREGON, INC., an Oregon corporation, *Defendant-Counter-Claimant-Plaintiff-Appellant.* | |

Appeal from the United States District Court
for the District of Oregon
Michael H. Simon, District Judge, Presiding

Argued and Submitted October 7, 2016
Portland, Oregon

Filed July 24, 2017

Before: Diarmuid F. O'Scannlain, Richard R. Clifton,
and Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge O'Scannlain;
Concurrence by Judge Clifton

# SUMMARY[*]

## Antitrust

The panel affirmed the district court's dismissal of an antitrust claim alleging anticompetitive activities engaged in jointly by a labor union and a multi-employer collective bargaining association.

The panel held that the district court did not err in entering partial final judgment under Federal Rule of Civil Procedure 54(b) on an antitrust counterclaim in an action brought under § 301 of the Labor Management Relations Act. The panel affirmed the district court's conclusion that the antitrust issues were discrete and complex, and that the entry of partial final judgment would not result in duplicative proceedings.

The panel held that the counterclaimant had standing to challenge an alleged antitrust conspiracy redounding to the benefit of the collective bargaining association even though it was a member of the association.

The panel held that the *Noerr-Pennington* doctrine immunized the counterclaim defendants from antitrust liability for their conduct in filing lawsuits because they did not engage in sham litigation.

The panel held that the remainder of the counterclaim defendants' alleged joint activity was immunized from

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

antitrust liability under § 1 of the Sherman Act because of the nonstatutory labor exemption. The panel concluded that under the *Mackey* test, the alleged agreement restraining trade primarily affected the parties to the agreement and no one else; the agreement concerned wages, hours, or conditions of employment that were mandatory subjects of collective bargaining; and the agreement was produced from bona fide, arm's length collective bargaining. The panel held that an agreement that violates labor law does not always fail the second prong of the *Mackey* test.

Judge Clifton concurred entirely in the result and reasoning of the disposition as to the merits of the appeal. He wrote separately to express concern over the district court's decision to enter partial final judgment under Rule 54(b), and agreed with the opinion's admonition that a preferable approach would have been for the district court to certify its order for interlocutory appeal.

## COUNSEL

Thomas M. Triplett (argued), Michael T. Garone, and Kelly T. Hagan, Schwabe Williamson & Wyatt P.C., Portland, Oregon, for Defendant-Counter-Claimant-Plaintiff-Appellant.

Ronald F. Wick (argued), Cozen O'Connor, Washington, D.C.; Eleanor J. Morton (argued) Emily M. Maglio, and Robert S. Remar, Leonard Carder LLP, San Francisco, California; for Plaintiffs-Counter-Claim Defendants-Appellees.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether allegedly anticompetitive activities engaged in jointly by a labor union and a multi-employer collective bargaining association violate antitrust law.

I

A

ICTSI Oregon, Inc. ("ICTSI"), a subsidiary of International Container Terminal Services, Inc., began operating a marine shipping facility ("Terminal 6") in 2011, leased from the Port of Portland. It employed longshoremen and mechanics, among others, represented by the International Longshore and Warehouse Union ("ILWU"), a labor union that represents many of the shore-based laborers of the maritime industry.

ICTSI is a member of the Pacific Maritime Association ("PMA"), a multi-employer collective bargaining association representing many types of maritime employers who hire dockworkers and longshoremen. PMA represents ICTSI in collective bargaining negotiations with ILWU.

ILWU and PMA are parties to a collective bargaining agreement known as the Pacific Coast Longshore and Clerks Agreement (the "CBA") covering the entire West Coast of the United States which governed the employment terms for all longshoremen employed by ICTSI during all times relevant to this appeal. The CBA is administered by the Joint

Coast Labor Relations Committee ("Joint Committee"). The parties disagree over whether the Joint Committee, which meets regularly as the master labor-management committee under the CBA, has the authority to issue contractual interpretations that are binding on all signatories. ILWU and PMA agreed that, with some exceptions, all reefer work—the work of plugging, unplugging, and monitoring refrigerated shipping containers—would be performed by ILWU for all PMA members.

ILWU sought to perform the reefer work at Terminal 6, but such work had historically been within the jurisdiction of the International Brotherhood of Electrical Workers ("IBEW"). The Joint Committee met on May 23, 2012, to resolve the disputed work assignment and determined that the work belonged to ILWU and then ordered ICTSI to assign the work accordingly. ICTSI argued, and still argues, that the reefer work at Terminal 6 was not its to assign under the terms of its lease with the Port of Portland. On June 4, 2012, an arbitrator, claiming authority under the CBA's grievance provisions, determined that ICTSI was in violation of the CBA and ordered it to give the reefer work at Terminal 6 to ILWU. The Joint Committee issued another decision a few days later, incorporating the arbitrator's decision and reiterating its previous command that ICTSI grant the disputed work to ILWU. ICTSI also alleges that PMA, with the encouragement of ILWU, threatened numerous daily fines of $50,000 and even expulsion of ICTSI from the collective bargaining association to goad it into compliance with the Joint Committee decisions.

Meanwhile, ICTSI commenced a § 10(k) proceeding under the National Labor Relations Act ("NLRA"), before the National Labor Relations Board ("NLRB"), to resolve the jurisdictional dispute between the rival unions. 29 U.S.C. § 160(k). The NLRB issued a decision on August 13, 2012, finding that ILWU workers were not entitled to the reefer work at Terminal 6, but rather that IBEW workers were. *Int'l Bhd. of Elec. Workers*, 358 N.L.R.B. 903, 907 (2012).[1]

B

1

While the NLRB proceeding was pending, ILWU and PMA jointly filed this suit against ICTSI in federal district court under § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, asking it to order ICTSI to comply with the recently issued Joint Committee decisions.

ICTSI counterclaimed and alleged, among other things, that ILWU and PMA violated Sections 1 and 2 of the Sherman Act through their agreement to assign the disputed work to ILWU and their actions taken to enforce such agreement. 15 U.S.C. §§ 1–2. Specifically, ICTSI alleged that

---

[1] PMA responded by filing a suit in federal district court seeking to vacate the NLRB's decision. The district court granted summary judgment to PMA, but we reversed, concluding that the district court lacked jurisdiction to review the NLRB's decision. *Pac. Mar. Ass'n v. NLRB*, 827 F.3d 1203, 1213 (9th Cir. 2016).

ILWU and PMA used the collective bargaining process to create a monopoly over longshoreman work on the West Coast: ILWU benefits because only its workers are able to perform longshoreman work for PMA-member employers, and PMA benefits because it collects fees for each hour worked by ILWU longshoremen.

ICTSI further alleged in its counterclaim that in service of their agreement to monopolize West Coast port services, ILWU and PMA worked together to commit various illegal anticompetitive acts which reduced competition in the relevant market[2]—raising prices and injuring consumers. ICTSI claimed at least $4,000,000 in damages to itself as well.

---

[2] ICTSI, in its counterclaim, specifically alleged that (1) PMA, with the encouragement of ILWU, threatened ICTSI with daily fines of $50,000 for refusing to give the disputed reefer work to ILWU workers; (2) PMA threatened ICTSI with fines for initiating proceedings with the NLRB; (3) ILWU and PMA improperly used the Joint Committee to issue determinations before using the federal courts to enforce the collusive, illegal decisions issued by the Joint Committee; (4) ILWU and PMA discriminated against non-PMA members, as well as ICTSI, by the terms of the CBA granting some PMA members an exemption from provisions granting certain work to ILWU; (5) a PMA board member boycotted the Port of Portland over ICTSI's refusal to give the disputed reefer work to ILWU; (6) ILWU members engaged in slowdown activity at Terminal 6 even after the NLRB determined that ITCSI did not control the disputed reefer work; (7) ILWU and PMA filed sham lawsuits against ICTSI; (8) ILWU and PMA interfered in ICTSI's contractual relationship with the Port of Portland; (9) ILWU caused other unions to lose similar work in ports in Washington and San Francisco; (10) ILWU threatened third parties in other Oregon ports in order to gain access to longshoreman work; (11) ILWU violated the labor laws; and (12) ILWU and PMA used a jointly-run hiring hall to send inefficient and unqualified workers to ICTSI.

2

The district court stayed most of the parties' claims pending resolution of various disputes filed before the NLRB. However, the district court allowed ILWU and PMA to file a joint motion to dismiss ICTSI's antitrust counterclaim and then granted it under Federal Rule of Civil Procedure 12(b)(6), concluding that a shared monopoly claim was not viable under Section 2 of the Sherman Act and that the alleged anticompetitive conduct was immunized from antitrust scrutiny because of a combination of the *Noerr-Pennington* doctrine, the statutory labor exemption, and the nonstatutory labor exemption.

ICTSI moved for entry of a partial final judgment pursuant to Federal Rule of Civil Procedure 54(b), which the district court granted, dismissing ICTSI's antitrust counterclaim with prejudice. All other issues remain stayed in the district court pending the resolution of related NLRB proceedings.[3] This timely appeal followed.

---

[3] The related NLRB proceedings cited by the district court are Case Nos. 19-CC-87504, 19-CD-87505, 19-CC-82533, and 19-CC-82744. The cases were consolidated for review by an administrative law judge. *Int'l Longshore & Warehouse Union, AFL–CIO*, 363 N.L.R.B. No. 12, 2015 WL 5638153, at *2 (Sept. 24, 2015). On September 24, 2015, a three-member panel of the NLRB affirmed the judge's decision that ILWU violated labor law by engaging in improper job actions against ICTSI and that ILWU must cease engaging in such activity. *Id.* A three-member panel of the NLRB affirmed another administrative law judge's decision in Case No. 19-CC-100903, concluding that ILWU had engaged in improper work slowdown activities at Terminal 6 against ICTSI. *Int'l Longshore & Warehouse Union, AFL–CIO*, 363 N.L.R.B. No. 47, 2015 WL 7750748 (Nov. 30, 2015).

II

A

ILWU and PMA contend that the district court erred in entering a Rule 54(b) partial final judgment on the antitrust counterclaim. They assert that the facts and legal arguments of the antitrust counterclaim substantially overlap with other claims and counterclaims before the district court, and that the district court's grant of a partial final judgment will generate piecemeal appeals and waste judicial resources. *See Romoland Sch. Dist. v. Inland Empire Energy Ctr., LLC*, 548 F.3d 738, 747 (9th Cir. 2008). Accordingly, they argue that we should vacate the judgment. *See Morrison-Knudsen Co. v. Archer*, 655 F.2d 962, 966 (9th Cir. 1981) (concluding that if "[t]he claims disposed of by the Rule 54(b) judgment [are] inseverable, both legally and factually, from claims that remained unadjudicated in the district court, and there [are] no unusual and compelling circumstances that otherwise dictated entry of an early, separate judgment on that part of the case," the partial final judgment should be vacated).

We are satisfied that the district court did not err in concluding that ICTSI's antitrust counterclaim involved discrete legal issues separate from those involved in the § 301

ILWU filed petitions for review of both of these NLRB decisions with the United States Court of Appeals for the District of Columbia Circuit. Petitioners' Opening Brief at 3, *Int'l Longshore & Warehouse Union v. NLRB*, Nos. 15-1443, 16-1036 (D.C. Cir. Jan. 25, 2017) (discussing both petitions for review—the case challenging the Sept. 24, 2015 NLRB decision is referenced as Nos. 15-1344 and 15-1428 (D.C. Cir.)). The cases were consolidated for oral argument and are currently pending before the D.C. Circuit. *Id.* Proceedings in the instant case still before the district court remain stayed.

litigation or the adjudications still proceeding before the NLRB. It is true that the factual issues involved in such claim are closely tied to the factual issues in the labor-law claims still pending before the district court, but the antitrust counterclaim involves distinct points of law. Also, the legal issues before us are complicated and not routine. *See Wood v. GCC Bend, LLC*, 422 F.3d 873, 882 (9th Cir. 2005) (observing that in cases where common factual issues abound, the entry of a Rule 54(b) partial final judgment should be reserved for complex and distinct legal issues). Finally, we agree with the district court's determination that entry of a partial final judgment would result in no duplicative proceedings, even if we reversed the dismissal of the antitrust counterclaim. *Id.* at 879.

Whether the district court's decision to grant ICTSI's Rule 54(b) motion was correct is a close call. In circumstances such as these, we strongly prefer that the district court "certify its order for interlocutory appeal," which allows "the Court of Appeals to protect its docket by determining for itself whether to accept the issue for review." *Morrison-Knudsen Co.*, 655 F.2d at 966. However, because the issues before us are discrete and complex and we must give substantial deference to certain elements of the district court's analysis, we conclude that the district court did not err in entering a partial final judgment under Rule 54(b).

B

ILWU and PMA also contend that ICTSI lacks standing to challenge an alleged conspiracy redounding to the benefit of PMA because ICTSI itself was a member of PMA when PMA allegedly benefitted from said conspiracy. To have standing as an antitrust plaintiff, a party must demonstrate

antitrust injury, meaning it must show "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). An injury caused by an antitrust violation will not count as an antitrust injury "unless it is attributable to an anti-competitive aspect of the practice under scrutiny." *Id.*

We confronted an analogous situation in *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999). The plaintiffs in *Big Bear* alleged that a group of their competitors had engaged in a price-fixing scheme. *Id.* at 1102. Logically, then, the plaintiffs alleged a course of conduct from which they also stood to benefit. *Id.* We observed, however, that in such situations competitors "may have standing to challenge practices used to enforce a price-fixing conspiracy" if they allege injury from "practices used to enforce" the illegal conspiracy. *Id.*

Here, ICTSI has alleged that ILWU and PMA's illegal restraint of trade harmed competition by raising prices to supra-competitive levels. Importantly, ICTSI also alleged that it was harmed directly by the efforts of ILWU and PMA to enforce their illegal agreement. For example, ICTSI alleged that ILWU and PMA filed sham lawsuits against ICTSI in an attempt to force its hand.[4] This meets the *Big Bear* requirement that a party allege "injury resulting from practices used to enforce the alleged [illegal anticompetitive] conspiracy." *Id.* ICTSI thus has standing to bring its antitrust counterclaim.

---

[4] *See supra* note 2 (describing the harmful and illegal actions ILWU and PMA allegedly took against ICTSI to enforce their illegal agreement).

III

On the merits of the appeal, ICTSI contends that the district court made several errors in dismissing its counterclaim.[5]

A

ICTSI first contends that the district court erred in its interpretation of the *Noerr-Pennington* doctrine, which provides immunity and "broad antitrust protection for those who 'petition the government for a redress of grievances.'" *USS-POSCO Indus. v. Contra Costa Cnty. Bldg. & Constr. Trades Council, AFL-CIO*, 31 F.3d 800, 810 (9th Cir. 1994) (quoting *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 378 (1991)). ICTSI alleges that ILWU and PMA filed sham lawsuits in furtherance of their conspiracy to restrain trade and to monopolize longshore services.

Although *Noerr-Pennington* immunity extends to judicial proceedings,[6] it does not protect persons engaging in sham

---

[5] "We review dismissal of a complaint without leave to amend *de novo*." *Big Bear*, 182 F.3d at 1101. "All allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Id.* (quoting *Cahill v. Liberty Mut. Ins.*, 80 F.3d 336, 337–38 (9th Cir. 1996)). However, the party must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A complaint may be dismissed without leave to amend only 'when it is clear that the complaint cannot be saved by further amendment.'" *Big Bear*, 182 F.3d at 1101 (quoting *Dumas v. Kipp*, 90 F.3d 386, 389 (9th Cir. 1996)).

[6] ICTSI argues that ILWU and PMA waived the affirmative defense of *Noerr-Pennington* immunity. But this appeal followed ILWU and PMA's successful motion to dismiss ICTSI's antitrust counterclaim. Even

litigation. *USS-POSCO Indus.*, 31 F.3d at 810. Litigation will be labeled a sham if it is "objectively baseless," and "conceal[s] 'an attempt to interfere *directly* with the business relationships of a competitor.'" *Id.* (quoting *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 60–61 (1993)). In the context of a series of alleged sham proceedings, however, "the question is not whether any one [suit] has merit . . . but whether they are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." *Id.* at 811. In such a context, the legal success of an occasional sham suit is irrelevant. *Id.* ("[E]ven a broken clock is right twice a day.").

ICTSI has not alleged enough sham suits to establish a pattern of baseless or repetitive claims. ICTSI points to only two allegedly meritless suits, one by PMA and one by ILWU and PMA. Two sham suits cannot amount to "a whole series of legal proceedings" or a "pattern of baseless, repetitive claims." *Amarel v. Connell*, 102 F.3d 1494, 1519 (9th Cir. 1996) (quoting *USS-POSCO Indus.*, 31 F.3d at 811; *Prof'l Real Estate Investors*, 508 U.S. at 58).

Because there is no pattern of baseless claims, we engage in a two-step inquiry, evaluating each suit individually. Step one asks whether the alleged sham suit was meritless. *Prof'l*

---

assuming that *Noerr-Pennington* immunity is an affirmative defense—an assumption that may not be warranted—it would not be waived unless ILWU and PMA omitted it from their answer to ICTSI's counterclaim. *See* Fed. R. Civ. P. 8(c)(1); *see also Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 861 (5th Cir. 2000) (rejecting waiver argument where plaintiff "knew *Noerr-Pennington* was a potential issue throughout most of the discovery process"). ILWU and PMA have not yet answered the antitrust counterclaim.

*Real Estate Investors*, 508 U.S. at 60. The burden is on "the plaintiff to disprove the challenged lawsuit's legal viability." *Id.* at 61 (emphasis omitted). "Only if challenged litigation is objectively meritless may a court" proceed to step two to analyze whether the baseless suit was an attempt to directly interfere with the business of a competitor. *Id.* at 60–61.

This means that ICTSI must "disprove the challenged lawsuit's *legal* viability." *Id.* at 61. A suit has merit "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome." *Id.* at 60. For example, a suit is not objectively meritless if it is "arguably warranted by existing law or at the very least [is] based on an objectively good faith argument for the extension, modification, or reversal of existing law." *Id.* at 65.

1

PMA's suit collaterally attacking the NLRB's § 10(k) jurisdictional award was not objectively baseless. The district court, in fact, granted summary judgment in that case to PMA. *Pac. Mar. Ass'n*, 827 F.3d at 1204 (reviewing the district court's decision). While we reversed that decision, holding that the district court lacked jurisdiction, we noted that the NLRB's § 10(k) determination likely violated the NLRA. *Id.* at 1210. Even if the NLRB's jurisdictional award survives all further challenges, PMA's suit challenging the agency's determination is at least "arguably warranted by existing law" given that two federal courts have concluded it had substantial merit. *Prof'l Real Estate Investors*, 508 U.S. at 65.

2

The joint suit by ILWU and PMA against ICTSI under § 301 of the LMRA—from which the antitrust counterclaim of this appeal grew—is a more difficult case. The district court stayed claims related to reefer work at the Port of Portland pending resolution of the inter-union jurisdictional disputes before the NLRB and our court. But ILWU and PMA maintained the joint suit even after success became very unlikely. Once a § 10(k) order becomes final, it takes precedence over any inconsistent arbitration award. *See Carey v. Westinghouse Elec. Corp.*, 375 U.S. 261, 272 (1964); *Int'l Longshoremen's & Warehousemen's Union, Local 32 v. Pac. Mar. Ass'n*, 773 F.2d 1012, 1021 (9th Cir. 1985).

The NLRB has also repeatedly held that a § 301 suit brought to achieve results contrary to a § 10(k) award is illegal and constitutes an unfair labor practice. *See, e.g.*, *Sheet Metal Workers Int'l Ass'n*, 357 N.L.R.B. 1577, 1578 (2011) (affirming an ALJ's determination that "following the Board's 10(k) award, [a union]'s maintenance of its [§] 301 lawsuit was incompatible with the Board's award and, therefore, had an objective that was illegal under Federal law"); *Local 30, United Slate, Tile, & Composition Roofers, Damp & Waterproof Workers Ass'n*, 307 N.L.R.B. 1429, 1430 (1992).

However, the facts of ILWU and PMA's § 301 lawsuit suggest that it may be legally viable. ILWU and PMA brought their § 301 claim on June 13, 2012. The NLRB issued its § 10(k) determination on August 13, 2012. In response to such determination, the district court stayed the

§ 301 claim pending final resolution and then the exhaustion of appeals related to the NLRB's jurisdictional determination.

ILWU and PMA did not bring a frivolous § 301 suit when they initiated this lawsuit against ICTSI: an arbitrator had interpreted a CBA binding on PMA, ILWU, and ICTSI, and § 301 authorizes suits in federal court to enforce such decisions. Therefore, ILWU and PMA's suit to enforce the arbitrator's decision was not objectively baseless or frivolous at the time it was filed.

Though the suit was maintained after the NLRB's unfavorable ruling, ILWU and PMA were also collaterally challenging the § 10(k) award that would trump their § 301 suit. As recounted above, the collateral attack on the NLRB's § 10(k) decision proved unsuccessful, but only after two federal courts observed that the NRLB's decision was likely incorrect. ILWU continues to fight the NLRB's § 10(k) decision as well. *See supra* note 3. It would make little sense to hold that a suit lacked merit because it was maintained while the plaintiffs were actively challenging the impediments to such suit. The § 301 suit has not been frivolously maintained; rather, it has been "arguably warranted by existing law or at the very least [is] based on an objectively good faith argument for the extension, modification, or reversal of existing law." *Prof'l Real Estate Investors*, 508 U.S. at 65. That ends the inquiry: the § 301 suit is covered by *Noerr-Pennington* immunity.

B

ICTSI next contends that the district court erred when it concluded that the remainder of ILWU and PMA's alleged

"Joint Activity"[7] is immunized from antitrust liability under Section 1 of the Sherman Act because of the nonstatutory labor exemption, even though such activity allegedly includes actions by ILWU and PMA that violate labor law.[8]

1

The nonstatutory, or implied labor, exemption "recognizes that, to give effect to federal labor laws and policies and to allow meaningful collective bargaining to take place, some restraints on competition imposed through the bargaining process must be shielded from antitrust sanctions." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 237 (1996); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 676, 711 (1965) (Goldberg, J., concurring in part and dissenting in part) (discussing how the nonstatutory exemptions protects the scheme of collective bargaining sanctioned and mandated by the NLRA from being "destroyed by the imposition of Sherman Act" penalties). This exemption includes "some union-employer agreements."

---

[7] The Joint Activity includes all of the allegations discussed above, such as ILWU and PMA agreeing to discriminate against ICTSI and other non-PMA employers by treating PMA members preferentially. *Supra* note 2; *see also supra* note 3 (discussing NLRB decisions concluding that ILWU violated labor law).

[8] For example, it includes allegations that ILWU and PMA entered into an illegal agreement to engage in secondary boycotts against ICTSI with the purpose of seizing work for ILWU. The NLRA, in § 8(e), prohibits "hot cargo" agreements, as well as secondary boycotts or agreements to not do business with third parties, between employers and unions. 29 U.S.C. § 158(e).

*Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975).[9]

The nonstatutory exemption shields collective bargaining agreements and actions related to collective bargaining from antitrust liability. *Phoenix Elec. Co. v. Nat'l Elec. Contractors Ass'n*, 81 F.3d 858, 860 (9th Cir. 1996). The exemption prevents courts, sitting in antitrust, from asserting authority over the collective bargaining process and determining "through application of the antitrust laws, what is socially or economically desirable collective-bargaining policy." *Brown*, 518 U.S. at 242. It reflects antitrust law's complex relationship with labor law—a relationship complicated by Congress's struggle to determine where socially desirable anticompetitive action in support of labor ends and socially undesirable anticompetitive action, whether in support of labor or not, begins. *See, e.g.*, Richard A. Epstein, *Labor Unions: Saviors or Scourges?*, 41 Cap. U. L. Rev. 1, 18–23 (2013) (discussing the historical development of antitrust laws and its interaction with labor law).

Whether the nonstatutory exemption applies depends on the so-called *Mackey* test. *Phoenix Elec.*, 81 F.3d at 861 (citing *Mackey v. Nat'l Football League*, 543 F.2d 606, 614 (8th Cir. 1976)). An alleged agreement restraining trade is shielded from antitrust liability only if the following three parts of the test are satisfied: "(1) the restraint primarily affects the parties to the agreement and no one else, (2) the agreement concerns wages, hours, or conditions of

---

[9] The statutory labor exemption applies only where unions act unilaterally; therefore, it does not shield collective bargaining agreements from antitrust scrutiny. *See United States v. Hutcheson*, 312 U.S. 219, 231–32 (1941).

employment that are mandatory subjects of collective bargaining, and (3) the agreement is produced from bona fide, arm's-length collective bargaining." *Id.* Though developed in the Eighth Circuit, the *Mackey* test was formally adopted by this court in *Continental Maritime of San Francisco, Inc. v. Pacific Coast Metal Trades District Council*, 817 F.2d 1391 (9th Cir. 1987). *Id.*

2

ICTSI contends that the district court misapplied the *Mackey* test and thus erred in concluding that the Joint Activity was covered by the nonstatutory exemption. ICTSI also argues that conduct violating labor laws, particularly violations of Section 8(e) of the NLRA prohibiting secondary boycotts and related actions, cannot qualify for the nonstatutory exemption because post-*Mackey* cases have modified the test to exclude unfair labor practices and other illegal conduct. Both arguments rely on ICTSI's allegations that some of the Joint Activity violated labor laws.[10]

ICTSI's arguments focus on whether the second prong of the *Mackey* test—does the alleged agreement concern a mandatory subject of collective bargaining—precludes illegal agreements or related conduct from being covered by the nonstatutory exemption. ICTSI asserts that an illegal agreement never qualifies as a "mandatory subject[] of collective bargaining," and thus any illegal conspiracy fails prong two. *See Phoenix Elec.*, 81 F.3d at 861. Alternatively, ICTSI contends that the Supreme Court and our circuit have modified the *Mackey* test by adding the requirement that the alleged agreement conforms to the requirements of labor law.

---

[10] *See supra* note 8.

3

A cursory glance at Supreme Court precedent would seem to suggest ICTSI's contention that an illegal agreement always fails the *Mackey* test is correct. For instance, in 1975 the Supreme Court denied the nonstatutory exemption, observing that "[t]here is no legislative history in the 1959 Congress suggesting that labor-law remedies for § 8(e) violations were intended to be exclusive." *Connell*, 421 U.S. at 634. And the Supreme Court later read *Connell* as holding that agreements running afoul of Section 8(e) of the NLRA were "subject to the antitrust laws." *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 85 (1982). The Court explained that *Connell* decided whether the agreement in question violated § 8(e) because "[i]t was necessary to do so to determine whether the agreement was immune from the antitrust laws." *Id.*

However, we extensively analyzed *Connell* post-*Kaiser* and rejected the notion that every § 8(e) violation loses the benefit of the nonstatutory exemption. *Richards v. Neilsen Freight Lines*, 810 F.2d 898, 905–06 (9th Cir. 1987). In *Richards*, a trucking company alleged that the Teamsters union conspired with several rival trucking companies to engage in boycott agreements in violation of § 8(e). *Id.* Though the trucking companies were all formally rivals, the defendant companies were also customers of the plaintiff trucking company because the defendants would use the plaintiff company for the final stages of certain local deliveries. *Id.* at 900. The plaintiff alleged that the boycott agreements were for the purpose of pressuring the plaintiff to accept the Teamsters union. *Id.* at 905–06.

We concluded that "[e]ven if such conduct were a violation of the labor law, it would bear such a close and substantial economic relation to a union's legitimate [ends] that it falls well within the purpose and the coverage of the exemption from antitrust liability." *Id.* at 904. The *Richards* court read *Connell* to hold that agreements violating § 8(e) would fall outside the nonstatutory exemption only when the alleged agreements "pose actual or potential anticompetitive risks other than those related to a reduction in competitive advantages based on differential wages or working conditions." *Id.* at 906.

The alleged agreements in *Richards* "may have had an effect on [the plaintiff]," but such effect "apart from competition related to wages and working conditions, was not pervasive as with the agreement at issue in *Connell*." *Id.* Then-Judge Kennedy, writing for the court, concluded by observing that "[i]t is not paradoxical that a labor law violation may still be within the antitrust exemption, for the violation will carry its own remedies under the labor laws." *Id.*

While acknowledging that agreements violating § 8(e) could expose parties to antitrust liability, we concluded that *Connell* stood for the proposition that antitrust liability would attend such agreements only where there was some showing of substantial anticompetitive effects outside of those anticipated and protected by the nonstatutory exemption. *Id.* at 905 (citing *Connell*, 421 U.S. at 625 (discussing how the union's goal in this case would have substantial anticompetitive effects "that would not follow naturally from the elimination of competition over wages and working

conditions")).[11] We conclude this logic also extends to actions taken in support of such an agreement. *See id.* at 905–06 (discussing actions taken by the union to support the agreement).

Here, the Joint Activity alleged to violate § 8(e) has the purpose of gaining the reefer work at Terminal 6 for ILWU by suppressing competition. ICTSI contends that the conspiracy's ultimate purpose is "to expand the ILWU/PMA bargaining unit at the expense of third-party bargaining units" so that ILWU gains a monopoly, supported by PMA, over various types of West Coast port work.

Taking ICTSI's allegations as true, it still alleges no anticompetitive harm unrelated to wages and working conditions. Even if the ends of the allegedly illegal Joint Activity were achieved, the result would be that ICTSI replaced IBEW reefer workers with ILWU reefer workers at Terminal 6. The relevant market in which competition would be reduced is the labor market—specifically, the ability of other labor unions to compete against ILWU for this kind of work. However, in the course of advocating for benefits for

---

[11] Whether one views suppressing competition in the labor market to benefit labor as a desirable policy depends on one's political preferences, but is not at issue in the instant case. *See generally* Alex Bryson, *Union Wage Effects*, IZA World of Labor 2014:35 (July 2014), https://wol.iza.org/uploads/articles/35/pdfs/union-wage-effects.pdf (discussing the benefits and costs of labor unions with respect to their impact on the labor market); Ralph K. Winter, Jr., *Collective Bargaining and Competition: The Application of Antitrust Standards to Union Activities*, 73 Yale L.J. 14, 19 (1963). Congress has presumably exempted certain anticompetitive actions from antitrust scrutiny because it has determined that the social benefits of suppressing competition in the labor market sometimes outweigh the costs, and we must respect its decision. *See, e.g.*, *Brown*, 518 U.S. at 242.

their members, labor unions may have to suppress competition relating to wages and working conditions. *See Richards*, 810 F.2d at 806 (discussing the impact union activity had on competition in the labor market). Any harms flowing from suppressing competition among labor unions in the instant case would be "related to a reduction in competitive advantages based on differential wages or working conditions." *Id.*

In fact, the situation in this case is very analogous to *Richards*: ICTSI alleges that formal rivals, who are also customers, have entered into illegal agreements with a union which would allow the union to seize work at the facility operated by ICTSI. *Richards* could be distinguished from this case insofar as the work sought by ILWU is currently being performed by another union, IBEW, instead of non-unionized workers. But, the only anticompetitive harm that ICTSI alleges is that ILWU would be able to capture anticompetitive wages by suppressing competition, leading to higher prices for consumers. The suppressed competition just happens to be another labor union instead of individual workers. In both cases competition amongst labor is being suppressed to benefit a specific union. ICTSI alleges agreements that, even if illegal and "carry[ing] [their] own remedies under the labor laws," *id.*, are still "within the purpose and the coverage of the exemption from antitrust liability." *Id.* at 904.

"[I]n some cases a violation of the labor laws may involve conduct whose consequences are so far-reaching that it falls outside the exemption," but that is not the case here. *Id.* at 906. For example, in *Connell*, a building trades union ("Local 100") "supported its efforts to organize mechanical subcontractors by picketing certain general contractors." 421 U.S. at 618. If Local 100 succeeded, "the restriction on

subcontracting would eliminate competition . . . on subjects unrelated to wages, hours, and working conditions [and] could result in significant adverse effects on the market and on consumers . . . unrelated to the union's legitimate goals of organizing workers and standardizing working conditions." *Id.* at 624. Here, ICTSI has failed sufficiently to allege that the Joint Activity will lead to anticompetitive harms "that would not follow naturally from the elimination of competition over wages and working conditions." *Id.* at 625.

ICTSI counters *Richards* by pointing out that illegal conduct is not a mandatory subject of collective bargaining. But, we have never explicitly or implicitly overruled *Richards*, which held that agreements violating § 8(e) did not automatically lose the benefit of the nonstatutory exemption. For example, *Phoenix Electric* and *Richards* can be reconciled by reading *Richards* as holding that illegal agreements still satisfy prong two of the *Mackey* test if such agreements concern mandatory subjects of collective bargaining. *Compare Phoenix Elec.*, 81 F.3d at 861, *with Richards*, 810 F.2d at 905–06. As discussed above, *Richards* also covers conduct in support of an illegal agreement. *See Richards*, 810 F.2d at 905–06. This interpretation is supported by our court's emphasis in later cases on whether or not the alleged conduct is "regulated by labor law" and "anchored in the collective-bargaining process." *See, e.g.*, *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1131 (9th Cir. 2011) (en banc). And work assignments are a mandatory subject of collective bargaining. *Antelope Valley Press*, 311 N.L.R.B. 459, 460 (1993). Labor law, not antitrust law, should generally govern work assignment disputes.

Illegal conduct relating to "mandatory subjects of collective bargaining," such as wages or conditions of

employment, does not remove the alleged agreements or related conduct from the scope of the nonstatutory exemption under the *Mackey* test. This includes violations of § 8(e).

4

ICTSI further contends that *Richards* is no longer good law. ICTSI points to two cases in particular, *Brown*, 518 U.S. 231, and *Safeway*, 651 F.3d 1118, that purportedly overrule *Richards*.

In *Brown*, the Supreme Court held that the nonstatutory exemption covered an employer-only agreement among a multi-employer bargaining unit. 518 U.S. at 238. *Brown* arose out of failed collective bargaining negotiations between the National Football League, a group of employers, and the NFL Players Association, a labor union. *Id.* at 234–35. When the parties bargained to impasse over the pay and working conditions of young, rookie players on the various teams' development squads, the League unilaterally imposed the terms of its last, best offer on the players. *Id.* Hundreds of players on the development squads brought a suit under Section 1 of the Sherman Act. *Id.* at 235. At trial, the district court held that the League could not avail itself of the nonstatutory exemption. *Id.* The Court of Appeals for the District of Columbia Circuit reversed in an opinion eventually affirmed by the Supreme Court. *Id.* The Supreme Court concluded that the nonstatutory exemption applied because the alleged conduct grew out of a lawful collective bargaining process, involved matters of mandatory bargaining, and concerned only the parties to the collective bargaining relationship. *Id.* at 250.

*Brown* contains numerous references tying the Supreme Court's holding to approval of the alleged conduct in labor law cases.[12] The Court began its analysis by "assum[ing] that such conduct, as practiced in this case, is unobjectionable as a matter of labor law and policy." *Id.* at 238. More importantly, the court specifically tied its conclusion to such legality. *Id.* ("On that assumption [of legality], we conclude that the exemption applies.").

But *Brown* did not review the applicability of the nonstatutory exemption generally. Rather, *Brown* dealt with whether the exemption, traditionally applied to collective bargaining agreements between employers and employees, should *extend* to the context of employer-only agreements. *Id.* at 238. In this respect, tying the holding of *Brown* to labor law's approval seems to make sense: employer-only collusion logically presents a greater risk of cartel-generating activity that harms the interests of labor than an agreement formed with the input of both management and labor. And the Court also recognized that the scope of the collective bargaining exemption from antitrust scrutiny cannot be limited strictly to terms to which both labor and management give consent: the nonstatutory exemption must apply, for instance, to a multi-employer bargaining group's discussions about positions taken both before and after impasse. *Id.* at 243–44.

---

[12] When collective bargaining is undertaken in good faith, but labor and management reach an impasse as to terms covering wages, working conditions, and other mandatory terms of bargaining, the employer is allowed to impose its last, best offer without committing an unfair labor practice or violating the law. *Brown*, 518 U.S. at 238 ("Both the Board and the courts have held that, after impasse, labor law permits employers unilaterally to implement changes in pre-existing conditions, but only insofar as the new terms meet carefully circumscribed conditions.").

Though *Brown*'s holding does rely, in part, on the labor-law legality of the conduct in question, the opinion also notes that such conduct's close relation to the collective bargaining process distinguishes it from the class of behavior governed by antitrust law. The Supreme Court noted that "labor laws give the Board, not antitrust courts, primary responsibility for policing the collective-bargaining process." *Brown*, 518 U.S. at 242. In expanding the nonstatutory exemption to some employer-only agreements, the Supreme Court did not require that only conduct blessed by the labor laws could receive the exemption going forward. Nor did the court overrule *Richards*, *Phoenix Electric*, *Mackey*, or related cases. *But see Eller v. National Football League Players Ass'n*, 731 F.3d 752, 754–55 (8th Cir. 2013) ("[A] nearly unanimous Supreme Court . . . overrul[ed] *Mackey* . . . .").

Similarly, in *Safeway* our court applied *Brown* to determine whether the nonstatutory exemption applied in the context of a multi-employer bargaining association's unilateral action. 651 F.3d at 1128–32. In *Safeway*, a group of employers decided to share and to redistribute certain revenues in the event that a party to their agreement experienced a strike or lockout. *Id.* at 1123. The en banc court denied the nonstatutory exemption, noting that the employers' agreement was not "approved or *regulated* by labor law." *Id.* at 1131 (emphasis added). The conduct in the instant case—work assignments—is regulated by labor law. The revenue sharing agreement in *Safeway* was not the type of issue historically regulated by labor law. *Id.* at 1130. Finally, we never held that conduct violating labor laws automatically fell outside of the nonstatutory exemption.

5

But does the *Mackey* test justify application of the nonstatutory exemption to the alleged Joint Activity?

First, the alleged conduct primarily affects the parties to the agreement. ICTSI is a member of PMA and a party to the CBA, and there are no allegations in ICTSI's counterclaim that the CBA purports to govern the conduct of nonparties. *See Phoenix Elec.*, 81 F.3d at 862 (finding it relevant to the first prong of *Mackey* that an agreement "does not attempt to impose its terms on any nonsignatory party").

Second, the alleged anticompetitive agreement between ILWU and PMA giving rise to the Joint Activity concerns a mandatory subject of collective bargaining under Section 8(d) of the NLRA. 29 U.S.C. § 158(d). Work assignments are a mandatory subject of collective bargaining, though the scope of the bargaining unit is not. *Antelope Valley Press*, 311 N.L.R.B. at 460. ICTSI admits in its pleadings that ILWU and PMA have negotiated collective bargaining agreements for many years "covering virtually all longshore work in all West Coast ports." Specifically, ICTSI alleges that the CBA assigned reefer work within the bargaining unit to ILWU, and that ILWU had performed this work at some West Coast ports before that time. ICTSI alleges, therefore, that the alleged agreements between ILWU and PMA concerned work assignments within the bargaining unit of the West Coast. *See Maui Trucking, Inc. v. Operating Eng'rs Local Union No. 3*, 37 F.3d 436, 439 (9th Cir. 1994) (suggesting that the "relevant work universe [is] coextensive with the bargaining unit").

Finally, the alleged Joint Activity was the result of a bona fide, arm's-length agreement. ICTSI alleges that there is at least a factual question as to the third *Mackey* requirement—the good faith requirement—because ILWU and PMA would both benefit in the event that ILWU gains jurisdiction over additional work. ICTSI argues that the nonstatutory exemption presupposes an adversarial relationship.

*Phoenix Electric* gives little direction on what the good faith requirement entails, but the Eighth Circuit offers more guidance in *Mackey*, 543 F.2d at 615–16. In first applying what would become the *Mackey* test, the Eighth Circuit held that the evidence of one-sided bargaining in which one party dominated the other to impose unilaterally its own terms could not qualify as bona fide bargaining. *Id.* at 615 ("[T]he parties' collective bargaining history reflected nothing which could be legitimately characterized as bargaining."). The court noted an absence of any quid pro quo in the bargaining process in *Mackey*, and the relative bargaining strengths of the parties was also significant. *Id.* at 616. Presumably, this is part of the analysis that we adopted in *Phoenix Electric* when we endorsed the *Mackey* test. *Phoenix Elec.*, 81 F.3d at 861.[13]

---

[13] The Eighth Circuit concluded that the Supreme Court overruled *Mackey* in *Brown*. *Eller*, 731 F.3d at 754–55. However, this decision does not help ICTSI on the arm's-length question. Instead, *Brown* makes it easier for parties to argue their agreement is arm's-length—before *Brown* only union-employer agreements seemed to qualify for the nonstatutory exemption in NFL litigation, but now employer-only agreements qualify too (meaning employer-only agreements now qualify as arm's-length or such requirement no longer exists at all). *Id.*

Such conditions are absent from the allegations put forward by ICTSI. Some degree of quid pro quo between ILWU and PMA forms part of ICTSI's allegations: ICTSI notes ways in which the alleged agreements would benefit both ILWU and PMA. And the lack of an overly adversarial collective bargaining process should not, in itself, imperil the nonstatutory exemption. The purpose of labor law in the United States, after all, is to promote "sound and stable industrial peace." 29 U.S.C. § 171(a).

6

For all of the above reasons, the nonstatutory exemption shields the alleged Joint Activity of ILWU and PMA from antitrust scrutiny and ICTSI's counterclaim was properly dismissed.[14]

---

[14] Because the nonstatutory exemption covers all the Joint Activity in furtherance of the alleged conspiracy—including allegations that ILWU "engaged in slowdowns, work stoppages, safety gimmicks" and similar activities "to force ICTSI to assign the disputed work to the ILWU"—we need not reach, and choose not to reach, the question of whether the district court erred in applying the statutory exemption to shield certain activity by ILWU from antitrust scrutiny. The wrongs dismissed under the statutory exemption by the district court are shielded from antitrust liability by the nonstatutory exemption.

We also need not, and do not, reach the question of whether the district court erred by concluding that shared monopoly claims are not actionable under § 2. The dismissed § 2 claim is also barred by the nonstatutory exemption. *See Brown*, 518 U.S. at 235 (discussing "the 'nonstatutory' labor exemption from *the antitrust laws*" (emphasis added)).

IV

The judgment of the district court is **AFFIRMED**.[15]

---

CLIFTON, Circuit Judge, concurring:

I concur entirely in the result and reasoning of the disposition as to the merits of ICTSI's appeal. I write separately to express concern over the district court's decision to enter partial final judgment under Rule 54(b) on ICTSI's federal antitrust counterclaim. I agree with the opinion's admonition that, in circumstances like these, a preferable approach would be for the district court to certify its order for interlocutory appeal. Alternatively, the district court in this case should have refused appellate review altogether.

Most importantly, for purposes of Rule 54(b) certification, it is not obvious why there was "no just reason for delay" in entering partial final judgment on ICTSI's antitrust counterclaim. Fed. R. Civ. P. 54(b). Entering partial final judgment instead promoted a disfavored piecemeal appeal. *See Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1, 10 (1980). I accept the district court's determination, affirmed by our court's opinion, that the antitrust counterclaim raised discrete and independent issues of law. Even so, the counterclaim was ultimately secondary to the primary dispute at issue in this case: a jurisdictional dispute between rival unions over reefer work assignments.

---

**[15]** ICTSI's motion for judicial notice is **GRANTED**. *See Small v. Avanti Health Systems, LLC*, 661 F.3d 1180, 1186 (9th Cir. 2011).

Allowing the main action to proceed at the district court, even if stayed pending the resolution of related NLRB proceedings, may have resulted in resolution of the parties' primary dispute, thereby obviating the need for an appeal addressing ICTSI's follow-on antitrust counterclaim. Under these circumstances, I cannot say that the interests of "sound judicial administration" were served by this appeal. *Wood v. GCC Bend, LLC*, 422 F.3d 873, 882 (9th Cir. 2005).

We have treated the judgment as final, and that makes sense at this point for reasons of efficiency and simplicity, but I hope this is not a course that is repeated in the future.